**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Case No.  08-CV-2832** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **EUCLID CITY SCHOOL BOARD,** *et al.*, | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |

## I.  INTRODUCTION

The Court today considers what appears to be a matter of first impression within this circuit. The parties before it have stipulated that Defendant Euclid City School Board (the "Board") has violated § 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1973 ("Section 2").  It is uncontroverted that minorities in Euclid have been systematically denied the opportunity to elect their preferred candidates to the Board.  So, too, the parties agree that the Board must be given an opportunity to propose a legally acceptable remedy for this past discrimination before this Court may consider alternatives.  There, however, agreement ends: the parties suggest sharply different approaches to evaluating whether a remedy is "legally acceptable" and propose starkly different changes to the Board's electoral mechanism for selecting its membership.

The United States argues that a remedy is not legally acceptable unless it is reasonably expected to result in the election of minority-preferred candidates based on past minority voting patterns.  In particular, the United States argues that a legally acceptable remedy is one that will necessarily result in roughly proportional representation, even if minority turnout is substantially lower than non-minority turnout.  Because the United States argues that the Board's proposed remedies

(noted below) do not satisfy this standard, the United States argues that the Court should fashion an acceptable remedy of its own, which, it asserts, is one that would cease use of the Board's current at-large election system.  In particular, the United States has proposed that the Board be divided into five single-member districts, with one of those single-member districts designed so as to contain a large enough African-American population to ensure the election of an African-American candidate.[1]

The Board, for its part, counters that a legally acceptable remedy need only provide the opportunity for meaningful participation.  The Board asserts that historical turnout patterns are of no moment, and argues that a remedy is legally acceptable even when it requires that minority turnout increase substantially from historical norms for minorities to achieve actual representation in the political process.  They argue that a plan is legally acceptable so long as it would provide representation were minorities to vote at the same rate as non-minorities.  To that end, the Board proposes two different possible systems: cumulative and limited voting.  In both proposals, the Board seeks to maintain its current size, the current at-large voting structure, and the current system of using staggered terms (*i.e.*, in alternating odd years, electing three members and then two members for four year staggered terms to the five seat Board).

After careful consideration, while, for reasons explained below, the Court ultimately rejects both parties' legal theories, it orders implementation of one of the Board's alternative remedies: limited voting.  In sum, the Court finds the Board's suggestion that the Court ignore historical turnout rates in its evaluation of a proposed remedy under Section 2 unpersuasive.  Minority voters in Euclid have historically turned out to vote at only a fraction of the rate of non-minorities, in part due to the longstanding absence of a meaningful opportunity to participate in the political process.  A legally

---

[1] As discussed more fully below, during the May 20, 2009 hearing on this matter, the United States also proposed an alternative remedy.  Specifically, the United States argued that, if the Court were to conclude that the United States' proposed single-member district format was not required to remedy the Section 2 violation, the Court should at least eliminate the staggered terms aspect of the current electoral system.

acceptable plan must accommodate this reality; a remedial plan cannot ignore historical reduced minority turnout resulting from the very discriminatory practices that violated the Voting Rights Act in the first instance. This Court also finds, however, that the United States is mistaken as well. The province of a court is to ensure genuine opportunity for all citizens, not to guarantee particular electoral results. Applying what it believes to be an appropriate and considered approach to the remedial analysis required in this context, the Court concludes that the Board's limited voting proposal is an acceptable and appropriate remedy for the Section 2 violation at issue here. Thus, the Court concludes that the **DEFENDANT** has proposed a legally acceptable remedy and **ORDERS** the Board and the Cuyahoga County Board of Elections to implement **LIMITED VOTING** for the Euclid City School Board elections, as described below.

## II. BACKGROUND

The Board has conceded that its current method of elections denies minorities the opportunity to participate meaningfully in the political process, in violation of Section 2. (Stipulation of December 2, 2008 ("Stip.") (Doc. 2).) This stipulation is based in part on the conclusions reached by this Court during prior litigation (*see id*. at ¶ 12), which considered the very same electoral population before the Court today, *see United States v. City of Euclid* ("*Euclid I*"), 580 F. Supp. 2d 584 (N.D. Ohio 2008); *United States v. City of Euclid* ("*Euclid II*"), 523 F. Supp. 2d 641 (N.D. Ohio 2007).[2] Findings from that litigation are thus incorporated into this record.

---

[2] In *Euclid I*, this Court issued a published opinion announcing its findings of facts and conclusions of law reached during an earlier bench trial. In that opinion, the Court found that the method of elections employed by the Euclid City Council (the "Council") violated Section 2. In *Euclid II*, the Court issued an opinion accepting the parties' proposed remedy for the violation found in *Euclid I*. This case, "*Euclid III*," considers the Euclid School Board, a different political body than the Council that, nevertheless, shares a common electorate with the Council.

### A.  Euclid's Demographics

The City of Euclid is experiencing rapid demographic changes.  While African-Americans represented a mere one-half of one percent of Euclid's total population during the 1970's, this figure increased to 7.8% during the 1980s.  *Id*. at 587.  By the 1990 Census, 16.2% of Euclid's total population was African-American and, over the next ten years, the percentage of African-Americans nearly doubled again, to 30.5%.  *Id.*  The proportionate growth of African-Americans has continued to increase rapidly to this day, and African-Americans now compose 44.6% of the total population according to the American Community Survey ("ACS") for 2005-2007.[3]

Indeed, the population of Euclid is shifting so rapidly that this Court considers meaningfully different demographic data in this case than it did in *Euclid I* and *Euclid II*.  Those cases relied upon the 2000 Census, the most reliable information available at the time of those decisions.  *See Euclid I*, 580 F. Supp. 2d at 594 ("The government's demographic information is derived from the 2000 Census.  While the City has attacked the use of this data as outdated, despite an opportunity to do so, the City has never provided reliable updated data which would give the Court an alternative benchmark against which to measure the issues presented.").  This case, conversely, relies upon the more current ACS data.  Of particular relevance, African-Americans comprised only 27.8% of the Voting Age Population ("VAP") during the 2000 Census, *id.* at 612, but now compose 40.2% of the VAP.  (Euclid Br. of March 2, 2009, Ex. 3 at 8 (Doc. 20-4).)  A comparison of either total population or VAP reveals that African-Americans have increased as a percentage of the population by approximately 50% since the 2000 Census, a significant increase by any measure.

---

[3] The parties have stipulated that 2005-2007 ACS data is the best estimate of "current city-wide population characteristics."  (United States' Trial Ex. 9; *see also* Hrg. Tr. of May 19, 2009 at 10:1-4); *cf. Johnson v. DeSoto County Bd. of Com'rs.*, 204 F.3d 1335, 1341 (11th Cir. 2000) ("[T]he presumption is [that] the Census figures are continually accurate, but . . .  this presumption is not irrebuttable." (citation omitted)); *cf. also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 409 (2006) (citing ACS data).

4

**B.  The Current Method of Electing Euclid's School Board**

In Euclid, Board members are currently elected on an at-large basis.  (Stip. ¶ 6.) The Board consists of five members, each of whom are each elected in odd-numbered years to four-year staggered terms.  (*Id*.)  Euclid voters, consequently, elect either two or three Board members every other year.  (*Id*.)  Three Board members will be elected in 2009, and two will be elected in 2011.  (*Id*.)

This method of election is, to some extent, governed by state law.  In particular, the State of Ohio mandates both staggered and four-year terms.  *See* O.R.C. §§ 3313.08 – 3313.09.  The Board does have some control over its size, which can range from between 2 and 7 members.  *See* O.R.C. § 3313.02.  Should the population of Euclid fall below 50,000 in the next decennial Census, however, State law would cap the Board at its current membership level.  *See id*.

**C.  Summary of African-American Participation in Euclid Politics**

Until last year, no African-American had ever been elected to serve as mayor, Council Member, or Board Member in the City of Euclid.  *Euclid I*, 580 F. Supp. 2d at 589.  Indeed, the first African-American to win an election in the City of Euclid, Kandace Jones, was elected only after this Court ordered redistricting and a special election.  *Id*. at 587.  She is, however, the only African-American to be elected to any of the aforementioned positions, even though, for example, three African-Americans have run for school board since 1987 and ten have run for city council since 1981.[4]

Likely both a cause and effect of the above, historical African-American turnout in Euclid has been extraordinarily low.  *See Euclid I*, 580 F. Supp. 2d at 604 ("[L]ow voter turnout has often been considered the result of the minority's inability to effectively participate in the political process." (citation omitted)).  The United States estimates, and the Board does not dispute, that only 7.4% of the African-American VAP participated in the 5 city-council elections between 1995 and 2003, compared

---

[4] One African-American, Howard Drake, was appointed to an open seat on the Board in 1998. Despite his experience as a Board member and the inherent advantage of incumbency, he was not elected to a full term in 1999.

to 32.0% of the non-minority VAP.  (Plaintiff's Br. of April 17, 2009, Ex. A at 4.)[5]  Both parties, moreover, seem to accept that African-American participation in Board elections during that time period were likely very similar.  It is noteworthy, however, that African-American turnout for the individual races including an African-American candidate was markedly higher, ranging from 7.9% in one 1995 contest to 17.0% in a 2001 race.  (*Id*. at 11.)[6]

It is also notable that the parties were not able to make more recent turnout estimates available to the Court.  For example, no evidence was presented to the Court about whether the rapidly shifting demographics in Euclid, this Court's *Euclid I* and *Euclid II* orders, the fact that an African-American was elected to city council in March of 2008, or the last presidential election have had any impact on African-American voter turnout in Euclid.  The parties simply do not provide any turnout estimates for the past 5 years.  While this may be a fairly short period of time in other circumstances, as noted below, it is meaningful here.

---

[5] The United States' expert report actually appears to contain data from the 2005 election as well.  (*See* Plaintiff's Br. of April 17, 2009, Ex. A at 10-11.)  During testimony, however, the United States' made clear that it only relied on data through 2003.  (*See* May 19, 2009 Hrg. Tr. at 130:13-18, United States' Expert Dr. Lisa Handley ("Question: You agree with Dr. Engstrom, don't you, that the elections that you relied upon to project turnout rates in the Board of Education's cumulative and limited voting plan occurred between 1995 and 2003, right? Answer: I'm not sure about the 1995. Probably. Certainly up through 2003.")).

[6] Throughout this opinion, the Court will refer to estimates derived from what is known as "Ecological Inference."  This method actually suggests a slightly higher number of African-American voters than the other method presented for the Court's consideration, "Ecological Regression."  (*See* Plaintiffs' Br. of April 17, 2009 at Ex. A at 4.)  Both methods have been accepted by courts, *see Euclid I*, 580 F. Supp. 2d at 596, and they are, in fact, increasingly employed together, *see id.*; *see also Etheredge v. Lexington County*, No. 3:03-3093, 2009 U.S. Dist. LEXIS 13385, at *44 (D.S.C. Feb. 19, 2009).  Although the Court considered both numbers in it analysis of this case, it lists only the Ecological Inference for linguistic simplicity.  The relatively small distinction between the two numbers in this particular case is, moreover, immaterial to the resolution of this matter.  (*Cf.* Hrg. Tr. of May 19, 2009 at 37:25-28:2, Board Expert Dr. Richard Engstrom ("I think at this point in political science . . . they are beginning to show a distinct preference for ecological inference. . . .").)

### III. LEGAL FRAMEWORK

#### A.  Liability under Section 2 of the Voting Rights Act

The Voting Rights Act prohibits any State or political subdivision from imposing  or applying "any qualification or prerequisite" to voting or "any standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  42 U.S.C. § 1973.  A court should inquire only as to whether a "standard, practice, or procedure" has the effect of denying minority voters the same opportunity to "participate in all phases of the political process as other citizens enjoy."  S. Rep. No. 97-417 at 28.  It is, therefore, unnecessary to show discriminatory intent to establish a violation of Section 2.  *Euclid I*, 580 F. Supp. 2d at 590; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 482 (1997) ("[P]roof of discriminatory intent is not required to establish a violation of Section 2. . . . The Voting Rights Act is the best example of Congress' power to enact implementing legislation that goes beyond the direct prohibitions of the Constitution itself." (citation omitted)).[7]

It is appropriate for a district court to credit stipulations when determining the existence of a Section 2 violation.  *See Dillard v. Crenshaw County* ("*Dillard I*"), 649 F. Supp. 289, 291 (M.D. Ala. 1986).  Nevertheless, a court must confirm that the parties before it have indeed stipulated to all of the elements establishing liability.  *See Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1559-1560 (S.D. Ga. 1994) ("[T]he factual record is deficient for the purpose of evaluating the merits of this case under Section 2. . . . [Because] the Proponents' stipulations are not unconditional or undisputed.").

Liability under Section 2 is established when a plaintiff can demonstrate the existence of racial bloc voting and a court then finds that, based on a totality of the circumstances, minorities have been denied equal opportunity to participate in the political process.  *Euclid I*, 580 F. Supp. 2d at 593.  The

---

[7] Here, the Board expressly denies any discriminatory intent.  The United States has proffered no evidence, and made no argument, to the contrary.

7

Supreme Court has explained that a plaintiff must show the existence of three preconditions to establish racial bloc voting:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.  If it is not, as would be the case in a substantially integrated district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates.  Second, the minority group must be able to show that it is politically cohesive.  If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.  Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed – usually to defeat the minority's preferred candidate.

*Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  These three preconditions have come to be known as the "*Gingles* preconditions."

The establishment of racial bloc voting under *Gingles* gives rise to a presumption of liability and "it would be the 'unusual case in which the plaintiffs can establish the existence of [racial bloc voting] but still have failed to establish a violation of [Section] 2 under the totality of the circumstances.'"  *Euclid I*, 80 F. Supp. 2d at 593 (quoting *Teague v. Attala County*, 92 F.3d 283, 293 (5th Cir. 1996)).[8]  This Court explained the framework for the totality of the circumstances analysis in *Euclid I*:

> [T]here are no limits on the circumstances a Court may consider when making this inquiry, [but] guidance does exist in the form of a non-exhaustive list of factors found in the Senate Report that accompanied the 1982 amendments to the Voting Rights Act (the "Senate Factors"). While not prerequisites themselves, and not the exclusive inquiries, courts regularly employ these factors as the first lines of inquiry in assessing the totality of the circumstances surrounding the voting practices and patterns in the relevant district or subdivision. The seven Senate Factors are:
>
> > 1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

---

[8] The totality of the circumstances analysis, of course, is both necessary and meaningful, as it establishes that minorities have actually been denied an equal opportunity to participate in the political process.

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

*See* S. Rep. No. 97-417, at 28-29 (footnotes omitted). The Senate Report recognized two further factors that, in some cases, warrant consideration as part of plaintiffs' evidence to establish a violation: (1) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and (2) whether "the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id.* at 29 (footnotes omitted).

The Senate Report observed that, while all of the factors "assist the court in determining whether, in the totality of the circumstances, vote dilution exists," it is not necessary that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.*

Since the 1982 amendments, courts have recognized two additional factors that are probative of the existence of vote dilution. The first additional factor, proportionality, compares the number of existing majority-minority districts to the minority population percentage. *See De Grandy*, 512 U.S. at 1014 n.11. Unlike Senate Factor Seven, which looks to the "political or electoral" success of minority candidates, proportionality looks to "the political or electoral power of minority voters." *Old Person v. Brown*, 312 F.3d 1036, 1042 (9th Cir. 2002) (quoting *De Grandy*, 512 U.S. at 1014 n.11). The second additional factor is racial separation. "[O]n-going racial separation . . . – socially, economically, religiously, in housing and business patterns – makes it especially difficult for [minority] candidates seeking county-wide office to reach out to and communicate with the predominantly white electorate from whom they must obtain substantial support to win . . . at-large elections." *United States v. Charleston County*,

> 316 F. Supp. 2d 268, 291 (D.S.C. 2003), *aff'd*, 365 F.3d 341 (4th Cir. 2004); *see McMillan v. Escambia County*, 688 F.2d 960, 967-68 (5th Cir. 1982), *factual findings adopted by* 748 F.2d 1037 (5ᵗʰ Cir. 1984). This factor differs from Senate Factor Five in that racial separation serves as a barrier to minority candidates while socioeconomic disparities serve as a barrier to minority voters.

*Euclid I*, 80 F. Supp. 2d at 591-93 (select citations omitted).  Ultimately, "[t]he central and dispositive question is 'whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"  *Charleston County*, 316 F. Supp. 2d at 298 (quoting *Gingles*, 478 U.S. at 63) (emphasis added).  In this case, the Court answers this question in the affirmative, with reference to the same broad array of historical, geographic, socio-economic, and practical electoral factors it considered in *Euclid I*.

**B.  Determining the Proper Remedy for a Section 2 Violation**

**1.  The Court Must Consider Whether the Defendant's Proposal is Acceptable Prior to Evaluating Other Potential Remedies**

A district court begins its remedial-phase evaluation under Section 2 of the Voting Rights Act by considering the defendant's proposed remedy.  (Plaintiff's Br. of April 17, 2009 at 3 (citing *Wise v. Lipscomb*, 437 U.S. 535, 539-41 (1978)); *see also Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006).  As the United States accurately notes, "[a] court must adopt a defendant's proposed remedy if the plan is legally acceptable."  (Plaintiff's Br. of April 17, 2009 at 3 (citing *Wise*, 437 U.S. at 541) (emphasis added)); *see also Cottier v. City of Martin,* 551 F.3d 733, 744 (8th Cir. 2008).  Undoubtedly, it is a "curious doctrine that allows the foxes, once challenged, to tell this Court that it must accept their plan for protecting and assuring the rights of the hens." *Henderson v. Bd. of Supervisors*, No. 87-0560, 1988 U.S. Dist. LEXIS 16729, at *13 (E.D. Va. June 6, 1988).  It is, however, the doctrine this Court is compelled to apply.  *See id*.

When evaluating a defendant's proposal, a court is not to inquire whether the defendants have proposed the very best available remedy, or even whether the defendants have proposed an appealing

one.  *McGhee v. Granville County*, 860 F.2d 110, 115 (4th Cir. 1988) (noting that a court may not "substitute its judgment of a more equitable remedy" in place of the defendant's proposal (citing *Upham v. Seamon*, 456 U.S. 37, 42 (1982))).  A district court may reject the defendant's proposal under only one condition: if that proposal "is legally unacceptable because it violates anew constitutional or statutory voting rights – that is, [if] it fails to meet the same standards applicable to an original challenge of a legislative plan in place."  *Id.*; *see also Goosby v. Town Bd. of Town of Hempstead*, 981 F. Supp. 751, 755 (E.D.N.Y. 1997); *cf. Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.").  That single question ends the Court's inquiry – a defendant need not even articulate a rationale for its preferences.  *Harper v. City of Chicago Hts.*, 223 F.3d 593, 602 (7th Cir. 2000) (Wood, J.) ("It is somewhat troubling that the City has not articulated why it prefers single-member districts over cumulative voting, but this is not an ironclad requirement for public bodies as long as the entity's actual preference can legitimately be inferred from facts on the record.").  A defendant's proposal, in sum, is accorded great deference, although "[i]t is well-settled that any proposal to remedy a violation of Section 2 of the Voting Rights Act, whether accorded deference or not, must conform to the requirements of that section and the United States Constitution."  *Henderson*, 1988 U.S. Dist. LEXIS 16729, at *13-14 (citation omitted).[9]

---

[9] The United States at one point asserted that the Defendants "bear a heavy burden" in proving that their proposed remedy will cure a Section 2 violation to the "greatest extent possible." (Plaintiff's Br. of March 2, 2009 at 3.)  This is inaccurate: the Board's proposed remedy is entitled to "great deference" and this Court may not inquire whether some other remedy might be better if the Defendant's remedy is "legally acceptable."  *McGhee*, 860 F.2d at 115; *see also Harper*, 223 F.3d at 599; *Hines v. Ahoskie*, 998 F.2d 1266, 1271 (4th Cir. 1993); *Mississippi State Chapter, Operation Push v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991); *Euclid II*, 523 F. Supp. 2d at 644; *Wilson v. Jones*, 130 F. Supp. 2d 1315, 1321-1322 (S.D. Ala. 2000); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1206 (E.D. Ark. 1990) (three-judge panel), *aff'd* 498 U.S. 1019 (1991).  This Court, much like the court in *Henderson*, is not entirely persuaded by the wisdom of this standard, but it is nevertheless the standard that district courts are to apply.

## 2. If the Defendant's Remedy is Unacceptable, a Court Must Create an Alternative

If the Defendant's proposal is not legally acceptable, the district court must then craft its own remedy. The Seventh Circuit has succinctly explained this process:

> When a Section 2 violation has been found, the district court must, wherever practicable, afford the jurisdiction an opportunity to remedy the violation first, . . . with deference afforded the jurisdiction's plan if it provides a full, legally acceptable remedy. . . . But if the jurisdiction fails to remedy completely the violation or if a proposed remedial plan itself constitutes a Section 2 violation, the court must itself take measures to remedy the violation.

*Harper*, 223 F.3d at 599-600. When searching for an appropriate remedy, a court may choose to rely on alternatives proposed by the plaintiff, *see Wise*, 437 U.S. at 541, but certainly is not required to do so.

If the district court must craft its own remedy, that remedy must, to the greatest extent possible, effectuate the policies and preferences expressed in the defendant's remedial plan. *Upham*, 456 U.S. at 41-42 ("[A court-ordered remedy should not] intrude on state policy any more than is necessary."); *Cane v. Worcester County, Md.*, 35 F.3d 921, 928 (4th Cir. 1994) ("The court, in exercising its discretion to fashion a remedy that complies with Section 2, must to the greatest extent give effect to the legislative policy judgments underlying the current electoral scheme or the legally unacceptable remedy offered by the legislative body."). Any plan created by the Court, of course, must "completely

---

The United States later seemed to concede that deference is *usually* appropriate, but then argued that this particular plan is not entitled to deference because the Ohio statute governing school board elections does not reference cumulative or limited voting. (Plaintiff's Br. of April 17, 2009 at 3 ("The statute regarding election of school board members does not mention cumulative or limited voting, nor has any school board in Ohio used cumulative voting or limited voting to elect its members. Under these circumstances, it may be an open question whether the Board's proposed plans are entitled to deference.").) This assertion, offered without citation or explanation, also seems unsupportable – a defendant's plan is not entitled to deference out of respect for statutory law in the abstract, but under the principle that a federal court should substitute its judgment for a state or municipality only when absolutely necessary and, even then, as minimally as possible. *See Upham*, 456 U.S. at 41-42 ("In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor intrude upon state policy any more than necessary." (quotation omitted)).

remed[y] the prior dilution of minority voting strength and fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dallas County Commission*, 850 F.2d 1433, 1441-42 (11th Cir. 1988).  Indeed, if a court must craft its own remedy, such a remedy is "subject in some respects to stricter standards than are plans developed by [the state]." *Upham*, 456 U.S. at 42.[10]

### 3.  Whether a Plan is Legally Acceptable

Whether a particular plan is legally acceptable is a fact-specific inquiry.  *See Harper*, 223 F.3d at 600 ("[A]t-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another election scheme."  (citing *US. v. Dallas County Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988))).[11]  Generally speaking, however, a legally acceptable plan is one that corrects the existing Section 2 violation without creating one anew.  *Euclid II*, 523 F. Supp. 2d at 644.  Such a plan must ensure equal opportunity in voting and afford the minority population a reasonable opportunity to elect its preferred candidate through meaningful participation in the political

---

[10] For example, single-member districts are strongly preferred for judicially crafted remedies. *See Citizens for Good Gov't v. City of Quitman, Miss.,* 148 F.3d 472 (5th Cir 1998).  A court must be mindful, however, that, when reviewing a defendant's proposed remedy, the same preference does not apply.

[11] So, too, no particular election scheme is required by Section 2; both limited and cumulative voting systems can be "legally acceptable."  *See Dillard v. Louisville* ("*Dillard IV*"), 730 F. Supp. 1546, 1548 (M.D. Ala. 1990).  Although there is dicta within the Sixth Circuit asserting that cumulative voting is not an acceptable remedy for Section 2 violations in judicial elections, *see Cousin v. Sundquist*, 145 F.3d 818, 829 (6th Cir. 1998), the parties argue that this statement is inapplicable here, both because it is dicta and because its logic applies only to judicial elections.  (*See* Plaintiff's Br. of April 17, 2009 at 3-4 n.3; Defendant's Br. of April 17, 2009 at 9-12 (extensively distinguishing *Cousin*); *id.* at 24-27 (arguing that cumulative voting has gained uniform acceptance as a remedy).)  This Court agrees.  *See Holder v. Hall*, 512 U.S. 874, 897-899, 908-913 (1994) (Thomas, J., concurring in the judgment) (expressing disapproval of current voting rights law and analogizing cumulative voting with proportional representation, but noting that "nothing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under § 2"); *see also, e.g., Cottier*, 475 F. Supp.2d at 936; *Cane*, 847 F. Supp. at 37; *Dillard IV*, 730 F. Supp. at 1548. Limited voting, as well, can be legally acceptable.  *Moore v. Beaufort Cty, N.C.*, 936 F.2d 159, 164 (4th Cir. 1991); *Cleveland County Ass'n for Government by People v. Cleveland County Bd. of Com'rs.*, 142 F.3d 468, 478 (D.C. Cir. 1998).

process.  *Id.*; *see also Hall v. Virginia*, 385 F.3d 421, 429 (4th Cir. 2004) ("Section 2 is a guarantee of equal opportunity in voting, ensuring that a minority group is not denied, on account of race, color, or language minority status, the opportunity to exercise an electoral power that is commensurate with its population in the relevant jurisdiction."); *Rural W. Tenn. African-American Affairs Council, Inc. v. Sundquist*, 209 F.3d 835, 843 (6th Cir. 2000).  Any valid remedy shall, moreover, give minorities the opportunity to elect minority candidates.  *Euclid II*, 580 F. Supp. 2d at 579 ("'[T]he Voting Rights Act's guarantee of equal opportunity is not met when candidates favored by blacks can win, but only if the candidates are white.'" (quoting *Rural W. Tenn.*, 209 F.3d at 840)); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 554 (9th Cir. 1998).

A reviewing court is obliged to be mindful, however, that, while a plan must provide a meaningful "opportunity to exercise an electoral power that is commensurate with its population," that is not the same as a guarantee of success.  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("We have said that the ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." (citation omitted)); *Baird v. Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992) (Easterbrook, J.) ("[T]he electoral process ensures equality of opportunity and not equality of outcome.").  The promise of Section 2 is that any barriers to truly equal political participation are removed for minorities, but a necessary part of equal participation is the possibility of a loss.  *Nevett v. Sides*, 571 F.2d 209, 236 (5th Cir. 1978) ("[Section 2 guarantees] an effective equality, although [it is] not a guarantee of equality of result – after all, the right to vote was protected, not the right to vote for the winning candidate."); *see also Earl Old Person v. Brown*, 312 F.3d 1036, 1044 (9th Cir. 2002); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1303 (S.D. Fla. 2002).

Certainly, a given defendant may choose to propose a plan that aims for rough proportionality, because it is safe to assume that a plan with such a feature does not dilute the vote in violation of

14

Section 2.  *Cf. Euclid II*, 523 F. Supp. 2d 645 ("As discussed above, the number of opportunity districts in the proposed remedial plan is roughly proportional to the percentage of Euclid's African-American voting-age population.").  Contrary to the United States' implicit assertion in this case, however, a proposed plan does not violate Section 2 merely because it will not *necessarily* result in roughly proportional representation.  *Cf. Johnson v. De Grandy*, 512 U.S. 997, 1013-14 (1994) ("The court failed to ask whether the totality of facts, including those pointing to  proportionality, showed that the new scheme would deny minority voters equal political opportunity.").  Such a contention confuses the use of proportionality as one tool through which a reviewing court determines the possible existence of vote dilution on the one hand, with a guarantee of proportional representation on the other.  *Solomon v. Liberty County Comm'rs* ("*Solomon II*"), 221 F.3d 1218, 1224 (11th Cir. 2000) (en banc) ("The degree to which minority candidates have achieved proportional representation may be relevant under the totality of the circumstances in a given case.  But it is important to keep the concepts of 'proportionality' and 'proportional representation' distinct.");  *see also De Grandy*, 512 U.S. at 1014 n.11 ("'Proportionality' . . . is distinct from the subject of the proportional representation.").  The former is common sense, the latter is prohibited by statute.  *See De Grandy*, 512 U.S. at 1014 n.11; *Seastrunk v. Burns*, 772 F.2d 143, 153 (5th Cir. 1985) ("The language of the Voting Rights Act itself provides expressly that, although the Act is intended to discourage discrimination against minority groups with respect to their opportunity for participation in the electoral process, it does not purport to guarantee or to compel minority representation in publicly elected bodies that is proportional to the racial makeup of the political unit."); *cf. Holder*, 512 U.S. at 956 (Ginsburg, J., dissenting) ("There is an inherent tension between what Congress wished to do and what it wished to avoid – between Congress' intent to allow vote dilution claims to be brought under Section 2 and its intent to avoid creating a right to proportional representation for minority voters." (quotations omitted) (citing *Gingles*, 478 U.S. at 84 (O'Connor, J., concurring in judgment))).

15

## IV. ANALYSIS

### A.  The Court Accepts the Parties' Stipulation as to Liability[12]

As previously indicated, the parties have entered into a stipulation as to liability in this action. (*See generally* Stip.)  The parties first note that *Euclid I* considered the very same population at issue here and agree that the findings in *Euclid I* are, thus, probative of and meaningful to the Court's assessment of liability in this case.  (*Id*. at ¶ 3 ("The electorate for the Euclid City Council and the Euclid City School District Board of Education is the same.  Thus, the findings of this Court in [*Euclid I*] . . . are probative of the vote dilution claim in the instant case. . . .").)  More specifically, the Board acknowledges that the *Gingles* preconditions demonstrate the existence of racial bloc voting among this electorate:

> Defendants acknowledge that the City of Euclid engaged in a vigorous and costly defense against the allegation that its election process for city council members violated Section 2 of the Voting Rights Act, and that, nevertheless, this Court ruled the United States proved beyond a preponderance of the evidence that a Section 2 violation occurred.  In light of this Court's ruling in *United States v. City of Euclid*, Defendants stipulate that the United States would establish at trial in this case the factors identified in *Thornburg v. Gingles*, 478 U.S. 30 (1986), which are probative of a vote dilution claim under Section 2.

(*Id*. at ¶ 12; *see also id*. at ¶ 10 (relating to the first *Gingles* precondition).)

The Board goes on to stipulate that the current method of elections has the discriminatory effect of denying African-Americans the equal opportunity to participate in the political process:

> Based upon this Court's findings and ruling in [*Euclid I*], Defendant Euclid City School District Board of Education further acknowledges that the current method of electing its members as set forth in the Ohio Revised Code operates with a discriminatory effect in Euclid so as to violate Section 2 of the Voting Rights Act.

(*Id*. at ¶ 13.)

---

[12] The Court made liability findings on the record on May 19, 2009, prior to commencement of the remedial phase trial in this matter.  (Hrg. Tr. of May 19, 2009 at 4:7-23.) This order confirms and expands upon those findings.

The Court finds that these stipulations establish liability under Section 2 of the Voting Rights Act.  As an initial matter, the Defendant directly states that "the current method of electing [Board Members] . . . violate[s] Section 2 of the Voting Rights Act."  Standing alone, this might be enough to justify a finding of liability.[13]  There is, however, substantially more.

First, while not separately conceding the applicability of the various Senate Factors, the Board concedes that this Court previously found that African-Americans in the City of Euclid suffered historical discrimination in housing, education, and employment that affected their ability to participate equally in the political process, that voting in Euclid historically has been racially polarized, and that the "slot" voting system and historical reliance on candidate slating enhanced the dilution of African-American voting strength in Euclid.  The Board does not suggest that these findings be reconsidered, nor does it claim that they are not meaningful to the liability analysis the Court undertakes here.  Indeed, it concedes that these findings are probative of that inquiry.

In addition, there has never been an African-American elected to the Board, even though African-Americans now make up more than 40% of the electorate.  This lack of proportionality, and the historical failure to elect minorities documented in *Euclid I*, also demonstrates that African-Americans have not been provided an equal opportunity to participate in the political process.  *Euclid I*, 580 F. Supp. 2d at 612 (citing *Rural W. Tenn.*, 209 F.3d at 844).

Collectively, the parties' stipulations, this Court's prior findings in *Euclid I*, and the lack of proportionality in past Board elections mandate the conclusion that Section 2 has been violated in connection with those elections.  This Court so finds, and turns to the question of the appropriate remedy for that violation.

---

[13] Of course, it is almost certainly enough to preclude the Board from challenging liability in the future, but that is a different question from whether it is enough such that a court ought to accept it without further inquiry.

### B.  The Board's Proposed Remedies

The Board proposes either limited voting or cumulative voting to cure its Section 2 violation. While the Board first appeared to express a strong preference for cumulative voting, by the time of the remedial hearing, the Board's counsel made it clear that the Board expresses no preference between them.  (Hrg. Tr. of May 20, 2009 at 216:12-14, Argument of Dean K. Smith ("Smith") ("[T]he fact that cumulative voting was listed first and limited second is almost a toss-up.")  Both systems work under a similar principle, and would have the same theoretical effect on minority representation in this case.  (Hrg. Tr. of May 19, 2009 at 18:10-14, Defense Expert Dr. Richard Engstrom ("Engstrom") ("Question: Did you reach a different result about cumulative as opposed to limited voting systems? Answer: No."); *see also id*. at 23:9-10.)  Under the Board's limited voting proposal, each voter would be able to vote for a single candidate in school board elections, even though multiple seats are vacant every two years.  For example, during the 2009 elections, every voter would vote for a single Board member, although three members would be elected.  In cumulative voting, on the other hand, voters would have three votes in the 2009 election, but would be able to aggregate those votes if they wished. In cumulative voting:

> Voters receive as many votes to cast as there are seats to fill; voters then may distribute these multiple votes among minority candidates in any way they prefer. Thus, voters may "plump" all their votes on one candidate – the strategy of choice for minority groups with intense preferences for a particular candidate – or give one vote each to several candidates. If five seats on a city council are to be filled, voters would have five votes each to distribute as they saw fit.

*McCoy v. Chicago Heights*, 6 F. Supp. 2d 973, 982 (N.D. Ill. 1998), *rev'd on other grounds,* 223 F.3d 593 (7th Cir. 2000) (quoting Richard Pildes & Kristen Donoghue, *Cumulative Voting in the United States*, 1995 U. Chi. Legal F. 241, 254 (1995)) (other citations omitted).

It is clear enough why, generally speaking, either of these systems provides a cohesive minority group increased opportunity relative to a traditional voting system.  In a district with extreme racial polarization, a minority group will be unable to elect a candidate because, of course, they are

18

outvoted for every available seat.  Indeed, this is the very result that has obtained in Euclid – to date, or at least prior to this Court's ruling in *Euclid I*, despite representing a significant percentage of the Euclid VAP, no African-American had ever won a city-wide election for City Council, School Board, or mayor.  On the other hand, under either limited or cumulative voting, if minority voters coalesce around a single candidate, that candidate <u>will</u> win so long as certain numerical conditions (discussed *infra*.) are met.[14]  Of course, a proposed remedy is not legally acceptable merely because it is better than the current system – a defendant may not come into court and promise to discriminate *less*; an acceptable remedy must not discriminate *at all*.

### 1.  Limited vs. Cumulative Voting

Although limited and cumulative voting have the same theoretical effect on minority representation in this case and are, thus, equally acceptable or unacceptable under the principles traditionally articulated in Voting Rights Act cases, as between the two, the Court finds limited voting to be the preferred option.  First, limited voting is in use throughout Ohio, whereas cumulative voting is currently unknown in this State.  (Smith at 217:2-6 ("Question: [B]ased on the testimony from the Board of Elections it appears that … at least in Ohio, limited voting is fairly common but cumulative voting is almost unheard of.  Answer:  That's correct, Your Honor.").)[15]  Second, the Cuyahoga

---

[14] To understand why this is, consider a simple example using limited voting where 11 voters, 4 minority and 7 non-minority, must vote to fill 2 Board positions.  As long as all 4 minorities vote for the same candidate, that candidate must win one of the seats.  This conclusion is compelled independently from factors such as the number of other candidates in the election or the particular distribution of the non-minority vote.  This outcome is quite robust; the same result obtains, for example, if there are 3 Board positions open, 4 minority voters, and 11 non-minority voters.  These results, moreover, are identical under cumulative voting, so long as minorities cumulate all of their votes behind a single candidate.

[15] Amicus argues that "cumulative voting is a familiar concept in Ohio because it, like many states, permits cumulative voting in corporate board of director elections."  (Amicus Br. of March 3, 2009 at 4 n.3.) The Court is always respectful of creative arguments so long as they are made in good faith, but this particular argument is something of a stretch given that any remedy will be targeted at an economically and politically disadvantaged group whose members are not the most likely to have voted in a large number of corporate elections.

County Board of Elections, which is responsible for administering voting procedures in Euclid, has explained that it would be difficult to implement a system of cumulative voting, whereas it would be straightforward to implement a system of limited voting.  (Hrg. Tr. of May 19, 2009 at 11:19-24, Argument of Frederick W. Whatley ("Whatley") ("Two of the proposed remedies we don't – would be easily done.  The third, cumulative voting, would be more difficult in ballot creation, tabulation, voter education, and poll worker education."); *id*. at 173:13-16, Testimony of Jane Platten, Director, Cuyahoga County Board of Elections ("Platten") ("Question: [L]et me ask you, can the Cuyahoga County Board of Elections even prepare [the type of cumulative ballot submitted as a sample by the Euclid School Board]?  Answer: We could not create this ballot in this style, no."); *id*. at 189:18-24 ("Question: And if, in fact, this Court were to order a limited voting scheme as a remedy here, you would take on essentially no additional burden in order to implement that order?  Answer: "That's absolutely correct. . . .").  Third, in part due to the first and second points noted above, and in part as a function of its inherent characteristics, cumulative voting is a more difficult concept for voters to understand.  This could make it more likely that voters in such a system commit errors while voting, which could lead to good faith votes being disallowed.[16]  Where, as here, the Court has found vote dilution due at least in part to historical discrimination in education, employment, and socio-economic factors, a remedy that makes the voting process more difficult and more complex, but does not contain a plan to educate voters on that process, would be counterproductive.

In the absence of any expressed preference between limited and cumulative voting on the part of the Euclid School Board, there is no reason to impose a new and more complicated system of voting

---

[16] The Court did consider the Board's contention that cumulative voting is reasonably well-understood by voters where it is regularly employed.  There is no evidence before the Court, however, that would allow it to conclude that this would be true where, as here, the party proposing cumulative voting does not also propose a comprehensive voter education program.  *See* Guinier, *No Two Seats, the Elusive Quest for Political Equality*, University of Virginia Law Review (1991), 77 Va. L. Rev. 1413, 1514 ("Another reason why voter education is important . . . is the relative complexity of cumulative voting.").

on Ohio voters, or to impose a difficult mandate upon Cuyahoga County.  The Court will, accordingly, consider only the limited voting proposal in the remainder of its analysis.

### 2.  The Board's Preference for At-Large, Staggered Elections

As a matter of law, the particular reasons that the Board might have for its preference is not of overwhelming importance.  A system that dilutes minority voting power is not made less dilutive because of good intentions, nor would a Court be justified in rejecting a proposed remedy in which minority voters were afforded the full and fair opportunity to participate even if that remedy were to have been designed by the most notorious racists.  As a practical matter, however, it is the better practice for a district court to acknowledge the non-discriminatory reasons that underlie a defendant's proposal where, as here, the Plaintiff challenges that proposal's compliance with Section 2.  *Cf. Harper*, 223 F.3d at 602 ("It is somewhat troubling that the City has not articulated why it prefers single-member districts over cumulative voting, but this is not an ironclad requirement for public bodies as long as the entity's actual preference can legitimately be inferred from facts on the record."). Indeed, a particularly tenuous non-discriminatory explanation for a policy preference can be probative evidence that a system does not afford minorities a truly equal opportunity to participate.  *Euclid I*, 580 F. Supp. 2d at 592.[17]

In this case, the Board relies primarily on amicus curiae, the Ohio School Board Association (the "OSBA"), to articulate what it describes as substantial non-discriminatory justifications for its preference for both at-large and staggered elections.  (*See* Amicus Br. of March 3, 2009.)  The United States does not challenge the legitimacy of any of the asserted non-discriminatory reasons, though it does argue that combining at-large elections with staggered terms can have a dilutive effect on a

---

[17] The converse, however, is not true – a particularly strong explanation is not considered probative of a system's validity.  Courts are to assume that a defendant with discriminatory intent may well have been successful in carrying out those intentions, whereas a defendant's pursuit of a race-neutral goal does not help a court determine whether that defendant has unintentionally designed a system in which minorities still are not provided equal access.

population's voter participation, and, as discussed below, asks that the Court forbid one of those practices here.

First, the OSBA notes that it would be much harder to fill Board seats without at-large elections.  (*Id*. at 5.)  In both 2003 and 2007, for example, only one candidate sought each of the two seats that were up for election and the OSBA notes that, in the absence of an at-large system, it is possible that neither of those two candidates would have been eligible.  (*Id*.)  Indeed, the OSBA asserts, and the United States does not dispute, that school districts in Ohio "sometimes find no one wants to run for the board," and that the elimination of at-large districts "would only further aggravate this problem."  (*Id*.)[18]

The OSBA also observes that at-large districts are important to school boards because the types of issues those boards address require district-wide support or accountability.  For example, school boards must determine whether to close a particular school and how to obtain approval for tax-levies. (*Id*. at 6-10.)  Geographic partisanship would make such decisions far more difficult and, at times, even impossible.  Indeed, use of at-large districts appears more important to school boards than other elected bodies, because "[u]nlike other political structures, school boards exist for the precise purpose of cultivating this consensus and shielding the provision of education from the clash of political conflict."  McClain, *The Voting Rights Act and Local School Boards: An Argument for Deference to*

---

[18] Although not essential to the Court's holding today, this is by no means a trivial concession on the part of the United States.  This would likely be sufficient, in and of itself, to eliminate any challenge to the "at-large" feature of the Board's proposed system.  It would be difficult to characterize a system as dilutive if that system is the only one under which a district can reliably field candidates.  Such a conclusion appears compelled by the general rule that a plaintiff cannot assert a successful claim under Section 2 absent an objective and workable benchmark against which the current voting system can be measured.  *See Holder*, 512 U.S. at 881 ("[W]here there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice, it follows that the voting practice cannot be challenged as dilutive under Section 2.") (Opinion of Kennedy, J.) (citing Opinion of O'Connor, J.).

*Educational Policy and Remedies for Vote Dilution* (1988), 67 Tex. L. Rev. 139, 171.[19]  Finally, the OSBA points this Court to troubling examples of recent misconduct on the part of school board officials in Ohio, and suggests that any action that reduces the number of qualified potential candidates for office, such as the elimination of at-large districts, might well increase the incidents of such misconduct.  (*Id*. at 10.)

The OSBA also makes a strong case that there are legitimate, non-discriminatory justifications for staggered terms.  In particular, they argue:

> Boards of education have immense responsibilities for the management and control of school districts.  These obligations include authorizing tax levy issues, appropriating funds, employing a superintendent, treasurer, principals, teachers and non-teaching employees, approving curricula and text books, serving as a quasi-judicial body for certain student or teacher disciplinary actions, engaging in the purchase or sale of property and construction of school facilities, and authorizing vendor contracts and paying debts or claims. . . .

> Staggered terms provide boards with continuity in the exercise of management discretion over these and other important matters. This method of electing board members allows for a gradual turnover in membership, rather than having the risk of an entirely new board take office at once. . . .

> [S]taggered terms reduce the frequency of . . . controversies and provide consistency in a board's management of a district.  A Section 2 remedy that denies boards these benefits would have the undesirable effect of increasing drastic swings in their memberships.  This turnover would erase institutional memory, foment sudden and unpredictable changes in board actions, and leave superintendents, other employees and students groping for moorings in fundamental matters ranging from employment security to curricula.

(*Id*. at 10-11.)  Simply, as the Board's counsel explained on May 20, 2009, "when you have five or seven member Boards of Education the possibility of a complete turnover is much greater than, for example, the United States Congress," and that risk threatens the Board's ability to operate and,

---

[19] The Board's expert, Dr. Richard Engstrom, explained that at-large voting also prevents "communities of interest" that may be developed around school-related issues (e.g., around academics, discipline, sports, the arts, etc.) from being split by arbitrary geographic divisions, such as those he believes would be imposed by the United States' proposed districting plan.  (Engstrom at 27:4-21.)

importantly, to monitor effectively the performance of the superintendent.  (Hrg. Tr. of May 20, 2009 at 219:18-24.)

The Court, for its part, independently concludes that the OSBA has articulated legitimate, non-discriminatory justifications for the use of both at-large elections and staggered terms.  The Court concludes, moreover, that the United States' attack on the continued use of staggered terms is neither well-supported, nor sufficient to justify ignoring the strong policy rationales underlying their use in school board elections.  The United States, relying on *City of Rome v. United States*, 446 U.S. 156 (1980), argues that "the Supreme Court recognizes staggered terms as one of many vote dilution devices in at-large elections." (December 2, 2008 filing at 4 (Doc. 2)).  This is not, however, exactly what *City of Rome* holds.  First, *City of Rome* does not consider Section 2; it considered a claim arising under § 5 of the Voting Rights Act ("Section 5").  Under Section 5, certain jurisdictions are prohibited from adopting any change to their electoral procedures that weaken minority voting strength (i.e., cause "retrogression").  *See City of Rome*, 446 U.S. at 185 ("[T]he purpose of § 5 has always been to insure [*sic*] that no voting procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral [process]." (citation omitted)).  For a court to conclude that the shift to staggered terms in a particular jurisdiction is retrogressive under Section 5 is very different than for a court to conclude that staggered terms themselves are necessarily dilutive under Section 2.  *Cf. Holder*, 512 U.S. at 881 (noting that certain retrogressive changes under Section 5 are not even cognizable as potential claims under Section 2).

Second, *City of Rome* found that the district court did not "clearly err" in concluding that "the electoral changes from plurality-win to majority-win elections, numbered posts, and staggered terms, when combined with the presence of racial bloc voting and Rome's majority white population and at-large electoral system, would dilute Negro voting strength." *City of Rome*, 446 U.S. at 183.  In other words, all of Rome's proposed changes, including staggered terms, collectively led to retrogression.

*City of Rome*, thus, stands for the proposition that staggered terms can be less advantageous in certain situations for minority voters, but does not stand for the proposition that staggered terms themselves are particularly likely to violate Section 2.[20]

The United States' additional citations also fail to support its contention that this Court must forbid the use of staggered terms as part of any remedy that does not employ a single member district plan.[21]  The United States cites, for example, to a scholarly book that discusses electoral reform, but its citation does not appear to relate to staggered voting; the citation, instead, stands for the unremarkable proposition that limited and cumulative voting are only effective at increasing minority representation when minorities vote.  *See* ELECTORAL REFORM AND MINORITY REPRESENTATION (Shaun Bowler, *et al.,* 2003) at 105 ("Latino candidates . . . win relatively few seats when participation levels are low.").  The United States also cites *City of Lockhart v. United States*. 460 U.S. 125, 148 n. 9 (1983) (Marshall, J., dissenting in part).  The problem with this citation is two-fold.  First, the United States is not citing the majority opinion (and did not indicate this to the Court); it is citing Justice Marshall's partial dissent.  The majority, rather, concluded that "the introduction of staggered terms has not diminished the voting strength of Lockhart's minorities."  *Lockhart*, 460 U.S. at 135.  More to the point, however, Justice Marshall himself does not say that staggered terms always will be dilutive. He explained, instead, that Congress identified staggered terms as potentially problematic under

---

[20] Notably absent from the evidence before the Court is any discussion regarding the impact of eliminating staggered terms when minorities comprise a particularly high percentage of the potential electorate, as they do in Euclid.  While it is true that staggered terms raise the threshold of exclusion necessary to elect a single member to the Euclid School Board, the parties have not explained whether this increases or decreases the ability of minorities to elect multiple candidates relative to an "unstaggered" system.  This is, of course, a question more complex than simple mathematics; the Court does not know, for example, whether the elimination of staggered terms might cause more minority candidates to run against each other.

[21] The United States' initial proposed remedy did not suggest the "unstaggering" of the current school system.  At the remedial hearing, however, the United States made clear that its willingness to consent to the continued use of staggered terms was premised on the Court's adoption of the United States' proposal, which called for the creation of single-member districts.

Section 5.  *Lockhart* 460 U.S. at 148 n. 9 (Marshall, J., dissenting in part).  As explained above, that is not the same as concluding that staggered terms are necessarily dilutive under Section 2.[22]

Balanced against the United States' rather weak attack on the use of staggered plans in all at-large electoral systems is the Court's obligation to give effect to the legislative policy judgments underlying the current electoral scheme and to effectuate the policies and preferences expressed in a defendant's proposed remedial plan.  Staggered terms for school boards are mandated throughout the state by long-standing provisions of Ohio law.  As pointed out by the OSBA, moreover, the policy reasons for that mandate are both considered and considerable.  And, as made clear at the remedial hearing, those same policy reasons motivate, in large measure, the remedial proposals advanced by the Board and are policy considerations on which the Board is unwilling to compromise, despite a willingness to reach compromises with the United States on a number of other important issues in this matter.

Ultimately, the Court is unpersuaded that, in the circumstances presented here, the use of staggered terms has a sufficiently dilutive effect to justify a refusal to adopt the Board's proposed remedy.  Having found that the mere presence of staggered terms does not disqualify the proposed remedy before it, the Court now turns to other factors to determine whether the remedy is otherwise inadequate to cure the Section 2 violation at issue here.

### 3.  The Standard Used to Measure the Board's Limited Voting Proposal

When evaluating a limited voting proposal, courts use a common political science construct that measures the "threshold of exclusion" to determine whether minorities have the opportunity to elect candidates of their choosing under a particular proposed system of limited voting.  The

---

[22] The United States also cites an article by Dr. Engstrom and testimony in another case from Dr. Engstrom.  The Court was unable to obtain the testimony, but it does note that the article itself is in accord with Dr. Engstrom's testimony in this case.  In that article, Dr. Engstrom noted that the "threshold of exclusion," defined below, cannot be set so high that it exceeds possible minority turnout, and that in some jurisdictions this may require the reduction or elimination of staggered terms.

"threshold of exclusion" is "the percentage of the vote that will guarantee the winning of a seat even under the most unfavorable circumstances." *Dillard v. Cuba* ("*Dillard III*"), 708 F. Supp. 1244, 1246 (M.D. Ala. 1988) (Thompson, J.); (*see also* Engstrom at 19:10-22 ("[T]he threshold of exclusion is a concept . . . a theoretical coefficient which looks at how large a group of voters must be in order to elect a candidate of their choice regardless of how the other voters vote. . . . I don't believe that it must be exceeded in order to elect. The threshold of exclusion is based on the worst case assumptions.").)

As ably explained by Judge Thompson:

> The worst case scenario that defines the threshold of exclusion is based on two assumptions. The first is that the majority sponsor only as many candidates as there are seats to be filled; for example, in a seven-seat jurisdiction, only seven majority-preferred candidates would run. The second is that the majority spread its votes evenly among its candidates, with no "crossover voting" for the minority-preferred candidate. If either of these assumptions is relaxed, then it is entirely possible for the minority candidate to win even if the minority does not constitute more than the threshold of exclusion in turnout.

*Dillard v. Chilton County Bd. of Education* ("*Dillard II*"), 699 F. Supp. 870, 874 (M.D. Ala. 1988); *Cottier v. City of Martin*, 475 F. Supp. 2d 932, 937 (D.S.D. 2007) ("Members of a cohesive minority will have an opportunity to elect the candidate of their choice so long as their percentage of the electorate population is greater than the threshold of exclusion."); *Cane v. Worcester County*, 847 F. Supp. 369, 372 (D. Md. 1994), *rev'd on other grounds*, ("[T]he Court will apply the coefficient called the threshold of exclusion."); Steven J. Mulroy, *The Way Out: A Legal Standard for Imposing Alternative Electoral Systems as Voting Rights Remedies* (1998), 33 Harv. L. Rev. 333, 337 ("[T]he threshold of exclusion has a high degree of reliability.").

Under the Board's proposal, the threshold of exclusion for the 2009 3-seat election is 25% and the threshold of exclusion for the 2011 2-seat election is 33.3%. (*See* Plaintiffs' Br. of April 17, 2009, Ex. A at 6.) In other words, assuming the worst-case scenario contemplated by the threshold of exclusion, African-Americans <u>will</u> elect a preferred candidate in 2009 if they comprise 25% of the voters on election day (as distinguished from VAP, the *potential* voters on election day) and African-

Americans <u>will</u> elect a preferred candidate in 2011 if they comprise 33.3% of actual voters.  (*Id*.)  The parties agree to this point.

### C. Whether the Board's Proposal Violates Section 2 Turns on How a Court Should Utilize the Threshold of Exclusion

The parties diverge, however, on precisely how a court should employ the threshold of exclusion when determining whether a proposed limited voting plan complies with Section 2 (*i.e.*, provides a meaningful opportunity for political participation).  The Board argues that a plan complies with the requirements of Section 2 so long as minority voters have any possibility of electing a preferred candidate on election day.  Specifically, the Board asserts that a court should measure the threshold of exclusion by assuming that election day turnout for minorities and non-minorities will be equal.  The Board's essential argument is that such an assumption shows that the minority group has a genuine opportunity to win, regardless of whether they take advantage of that opportunity.  Thus, the Board would have the Court look to the VAP for both African-American and non-minority populations in Euclid, assume an equal percentage of turnout from those respective populations, and apply those measures against the threshold of exclusion.

The United States, conversely, argues that a plan only complies with Section 2 if the historical turnout percentage of the current VAP is above the threshold of exclusion.  In other words, the United States argues that it is not particularly useful to consider what <u>might</u> happen and that a court must look to what it <u>knows</u> has happened.  Thus, the United States asks the Court to assume that African-Americans and non-minorities will turn out in the same percentages that they turned out in races for which historical turnout data exists (the years 1995 – 2003) and apply <u>those</u> percentages against VAP to decide if the threshold of exclusion is met.

The difference between the parties' proposals in this case is dispositive; the Board's plan is above the threshold of exclusion when relying only upon VAP and an assumption of consistent voter

turnout between minority and non-minority populations, but below it when using historical turnout data as a mechanism to predict future voter turnout rates.[23]

The parties, unfortunately, do not point this Court to any case law on which it could rely to conclude that either VAP or historical turnout is the correct metric under Section 2.  It actually seems quite difficult to support the exclusive reliance on either measure when one does examine relevant case law.  *See e.g.*, *Gingles*, 478 U.S. at 104 (discussing both population and registered voters); *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) ("The court may consider, at the *remedial* stage . . . [factors including] minority voter registration <u>and</u> turn-out rates.") (second emphasis added); *cf. Abrams v. Johnson*, 521 U.S. 74, 94 (1997) ("The District Court noted, however, that it was uncomfortable using percentages of registered voters rather than voting age population, since 'that in essence condones voter apathy.'").  The Court concludes that neither parties' proposed standard is entirely appropriate and that it must consider both VAP and the reality of substantially depressed minority voter turnout.  The Court's function is a predictive one – to use the theoretical construct of the threshold of exclusion to help it predict whether minorities will be provided a meaningful opportunity to participate in the political process *if* a proposed form of voting were to be implemented.  Because the Court's function is to answer this question to the greatest extent feasible,

---

[23] It appears that much of the controversy in this case would have been avoided had the Board simply proposed an increase in its membership from 5 to 7 as part of its proposed remedy.  When queried about this, both the Board and United States, citing *Holder v. Hall*, argued that such a proposal would be inappropriate under current Supreme Court precedent.  *See Holder*, 512 U.S. 874, 880.  The parties are mistaken – *Holder* finds only that a Plaintiff cannot bring a vote dilution claim based on the size of a legislative body.  The logic of the *Holder* plurality is straight-forward: there is no objective benchmark against which to measure a claim that a particular governmental body is the "wrong size."  *Id.* at 880-81 (opinion of Kennedy, J.) (citing opinion of O'Connor, J.).  There does not appear any reason to presume that, *having established liability*, a Defendant could not propose to alter its size as part of its chosen remedy, because, at the remedial phase, the question is only whether the Defendant's proposal violates Section 2.  Indeed, it seems that a Court-imposed remedy, too, could alter the size of a governing body in the right circumstances.

any formula that ignores the reality of the circumstances in which that predictive effort occurs would tend to warp the results.

Although framed somewhat differently, this is precisely the same conclusion reached in *Dillard II*.  There, Judge Thompson calculated the threshold of exclusion using VAP, and then inquired whether the totality of the circumstances supported his use of that number:

> [B]ased on a particular jurisdiction's totality of circumstances, a questioned election system may very well not be adequate for the jurisdiction, even though the percentage of black voters in the jurisdiction exceeds the threshold of exclusion for the system; and, conversely, the system may very well be fully adequate in another jurisdiction, even though the percentage of black voters in that jurisdiction is less than the system's threshold of exclusion. <u>The threshold of exclusion concept is therefore not an automatic cut-off point, but rather is a broad guideline which may be helpful in assessing the impact on minorities of present and proposed election systems.</u>

*Dillard II*, 699 F. Supp. at 874-875 (emphasis added).  This Court, in responding directly to the arguments made by the parties, below conducts an inquiry into the totality of the circumstances prior to calculating the threshold of exclusion, in order to determine whether there is a more appropriate number to use in this case than VAP.  What is critical to understand is that the fundamental inquiry is exactly the same – a court considering a limited or cumulative voting proposal must determine whether that proposal provides minorities a meaningful opportunity to participate in the political process by considering a combination of VAP and the existing political realities of the district.

To that end, as explained below, the Court will extend a well-established guideline utilized by courts to determine whether a single-member district affords a meaningful opportunity for political participation.  *See, e.g.*, *Ketchum v. Byrne*, 740 F.2d 1398, 1415 (7th Cir. 1984), *cert. denied*, 471 U.S. 1135, (1985).  Those courts begin their analysis by assuming that minorities may turnout at two-thirds the rate of non-minority voters.  *See, e.g.*, *id*.  This Court concludes that this use of a two-thirds guideline is equally appropriate as a starting point for its analysis of the Board's proposed remedy.  *Cf. id*.; *cf. also Euclid II*, 523 F. Supp. 2d at 645.

30

### 1.  Exclusive Focus on Turnout is Improper

Obviously, the results predicted by the threshold of exclusion only hold if actual election-day voters exceed it.  That being said, there is no right under the Voting Rights Act to win; there is, rather, a right to meaningfully compete.  *See Baird*, 976 F.2d at 359; *Salas*, 964 F.2d at 1556.  While the effects of long-standing electoral discrimination on voter turnout are undeniable, there is assuredly some point at which potential voters must themselves come to the polls.  This is likely the reason that four of the five courts previously to consider the threshold of exclusion employ VAP in their treatment of the concept, as opposed to a consideration of historical turnout.  *See Cousin*, 145 F.3d at 830; *Cane*, 847 F. Supp. at 372; *Dillard III*, 708 F. Supp. at 1246; *Dillard II*, 699 F. Supp. at 875; *but see Cottier*, 475 F. Supp. 2d at 937 (utilizing turnout to at least some degree).

This Court agrees, based on a consideration of five independently sufficient factors, that it would be inappropriate when evaluating a limited voting proposal to focus only on historical turnout rates, particularly those to which the United States asks the Court to look in this case.  First, such a focus would come dangerously close to guaranteeing a particular outcome for one group of voters, rather than ensuring equal opportunity.  *See Baird*, 976 F.2d at 359 ("[T]he electoral process ensures equality of opportunity and not equality of outcome."); *Nevett*, 571 F.2d at 236 ("[T]he right to vote [is] protected, not the right to vote for the winning candidate.").  In reaching this conclusion, the Court is particularly conscious that the threshold of exclusion measures the outcome under the "worst-case scenario."  *Dillard II*, 699 F. Supp. at 874; (*see also* Engstrom at 20:20-21:12 ("[The threshold of exclusion is] a very high bar, frankly. . . . I don't know that those assumptions have ever been fully met. . . . I don't think in the literature that you must exceed [the threshold of exclusion] in order to elect a candidate of your choice.").[24]  If a court were to combine such a "worst-case scenario" with

---

[24] The threshold of exclusion also makes an assumption about minority voters that is untrue in the real world – that they will aggregate their votes behind a single candidate.  The threshold of exclusion is referred to as a "worst-case scenario," however, because the corresponding assumptions

historically low turnout numbers, that court would be all but guaranteeing a particular outcome, a result that is clearly forbidden.  *See De Grandy*, 512 U.S. at 1014 n.11; *Seastrunk*, 772 F.2d at 153.[25]

Second, turnout under a discriminatory system is not necessarily predictive of turnout under a non-discriminatory system.  *Solomon v. Liberty County* ("*Solomon III*"), 899 F.2d 1012, 1018 (11th Cir. 1990) (en banc) (per curiam) (Kravitch, J., specially concurring) ("An at-large election system that frustrates the ability of minorities to elect their chosen representatives will naturally reduce the incentive for blacks to register to vote."); *Solomon v. Liberty County* ("*Solomon I*"), 865 F.2d 1566, 1574 (11th Cir. 1988) ("Minority voter registration figures are inherently unreliable measures in vote dilution cases because the very lack of minority political power responsible for the bringing of the Section 2 action also may act to depress voter registration.").  Indeed, the United States' own expert recently testified to this effect in another action.  *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 401 (S.D.N.Y. 2004) (three-judge panel) ("Dr. Handley's testimony supports the theory that black turnout will increase if they can elect candidates of choice."); (*cf.* Engstrom at 36:8-25 ("[W]hat [Dr. Hadley] projects [in this case] is given the turnout rates in those past elections – and they – they were held from

---

it makes about the non-minority electorate are even more unrealistic – that non-minority voters will perfectly allocate their votes between non-minority candidates in the most mathematically effective manner.

[25] The Court was, on this front, somewhat surprised by the Plaintiff's singular focus on the outcome of elections.  For example, during cross-examination of Engstrom, the Plaintiff repeatedly pressed the point that cumulative and limited voting did not result in the election of a minority candidate if minorities did not vote.  (*See, e.g.*, Hrg. Tr. of May 19, 2009 at 68:12-76:18; *id.* at 83:25-84:2 ("[I]sn't it fair to say that you don't know how difficult it will be to mobilize the African-American community to vote in School Board elections?")).  But, of course, *no system will result in the election of minority-preferred candidates if minorities do not vote*.  The Plaintiff's questioning seemed to miss the point – depressed turnout is relevant only to the extent that it is indicative of a system that impermissibly dilutes the vote in violation of Section 2.  It does not follow that simply because minorities do not vote, Section 2 is being violated.  The Plaintiff did not contend, for example, that cumulative or limited voting leads to lower minority turnout than single-member districts – *and this would have been the relevant comparison*.  The Court finds, based on the evidence before it, that the Board's expert framed the issue accurately.  (*Id.* at 76:7-13 ("Question: [I]sn't it true that the voting age population did not accurately predict the ability of the minority voters to elect a candidate of their choice?  Answer: No. . . . It may very well have provided the opportunity and it wasn't taken advantage of.").)

1995 to 2003. . . . [which] are old and also in a discriminatory electoral context. . . . I find that, that opinion, to be totally unpersuasive.").)  The Court concludes, commensurate with the Board's expert testimony and Dr. Hadley's testimony in *Rodriguez*, that it is unreasonable to assume that minority turnout will not increase under a system in which that turnout is made meaningful, relative to a system in which that turnout was entirely ineffective.  Such a conclusion is particularly appropriate, moreover, because the Court has already addressed vote dilution in this same voting population, and imposed a remedy to address it.  Here, this same minority population has been the beneficiary of a remedial order designed to increase its ability to participate in the political process *vis-à-vis* the election of city council members and has seen the changes imposed by that order bear fruit via election of the city's first ever African-American council member.  It would be irrational to assume that these changes, made and implemented well over a year ago, when combined with the additional changes necessarily flowing from this case, would have *no* effect on minority voter turnout.  *But cf. Rodriguez*, 308 F. Supp. 2d at 401 ("[T]here is no reliable evidence that any 'warming effect' would be sufficient to make Plaintiffs' Proposed District 8 a district in which blacks could elect candidates of choice.").

Third, although historical turnout might be somewhat probative in other situations, there is great reason to think that it is less useful here than in most other cases.  As an initial matter, the district is undergoing a rapid shift in its underlying demographics.  As the Court has already explained, there was a more than 100% increase in African-American population between 1980 and 1990 (to 16.2% of the population), nearly as large of an increase between 1990 and 2000 (to 30.5% of the population), and there has been nearly a 50% increase between 2000 and 2007 (to 44.6% of the population).  The particular historical turnout numbers that have been supplied for the Court's consideration, moreover, are quite stale.  They consider only 1995-2003 and do not incorporate either the March 2008 election in which Euclid ultimately elected its first-ever African-American council member, nor African-

American turnout from the most recent presidential election, in which national African-American turnout essentially was indistinguishable from non-minority turnout.

Fourth, the mechanical focus on historical turnout would artificially cap the potential for minority representation. In circumstances such as the one before the Court, where historical African-American turnout has been only a fraction of non-minority turnout, a Court's only available option if bound by those turnout numbers might well be to replace at-large representation, not with roughly proportional sub-districts, but with a district specially "packed" with minority voters, thereby possibly limiting minority representation rather than enhancing it. *Cf. Gingles*, 478 U.S. at 46 n.11 ("Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority."). Such a result is unsound, as such districts could themselves violate Section 2 if minority turnout or population increased. *See id.*

Finally, because it is clear that district courts should not consider turnout in determining liability under Section 2 of the Voting Rights Act, it would be inconsistent to *require* a court to consider *only* turnout at the remedial stage. *Cf. Euclid I*, 580 F. Supp. 2d at 603-03 ("Low voter turnout on the part of members of a minority does not militate against finding a Section 2 violation. . . . disenfranchisement, of a feeling that one's vote would be meaningless if exercised, often follows from, and is itself caused by, vote dilution. . . . The City's argument [that the Court should not find a Section 2 violation when minority turnout rates are low, because higher turnout rates might have resulted in different outcomes] turns the appropriate inquiry on its head."); *cf. also Negron v. City of Miami Beach*, 113 F.3d 1563, 1568 (11th Cir. 1997) ("What is relevant is that every member of the [en banc] *Solomon* [*III*] Court agreed that the district court had erred in focusing on registered voter statistics instead of voting age population statistics."); *Solomon III*, 899 F.2d at 1018 (Kravitch, J.) ("The district court incorrectly relied in part on the registered voter statistic and ignored the

proportion of voting age residents who are black."); *Solomon I*, 865 F.2d at 1574 ("We hold that reliance on the registered voting age population was improper.").  Of course, there is a very real distinction between those cases, all of which hold that turnout is not an appropriate measure to determine whether a minority group is sufficiently large to establish the existence of racial bloc voting under *Gingles*, and a remedial case, which inquires whether a proposed remedy affords minorities a meaningful opportunity to participate in the political process under the totality of the circumstances.  It is not sensible, however, to announce a rule that mandates a court to use VAP to determine the existence of racial bloc voting because turnout rates were likely artificially depressed by the very vote dilution giving rise to the Section 2 violation, but then requires the same court to look only at turnout when examining the effectiveness of a proposed remedy.  If historical turnout rates are considered unreliable measures at the liability phase of a Section 2 case because they fail to accurately portray what percentage of a minority population might vote under a non-dilutive electoral system, they cannot suddenly become the gold standard at the remedial phase, as the United States now argues.

In sum, this Court concludes that just as "a protected class is not entitled to Section 2 relief merely because it turns out in a lower percentage than whites to vote," *Salas v. Southwest Texas Junior College Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992), a proposed remedy may be acceptable even though it requires minorities to turnout above their historic rate in order to succeed in an election.  Turnout rates are a factor for the Court to consider in the assessment of a proposed remedy, but are only one factor among many.

### 2.  A Legally Acceptable Remedy Must Consider the Effects of Past Discrimination, Including Depressed Turnout

For many of these same reasons, the Court must also reject the contention that a court evaluating a limited voting proposal should only contemplate VAP, and should not consider depressed past turnout at all.  *Cf. Bone Shirt*, 461 F.3d at 1023 ("[T]he district court correctly considered . . .

35

[factors including] turnout rate."). It is clear that "low voter turnout in the minority community sometimes may result from the interaction of the electoral system with the effects of past discrimination, which together operate to discourage meaningful electoral participation." *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 986 (1st Cir. 1995); *see also Ketchum*, 740 F.2d at 1413 ("It is widely understood that minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice." (citation omitted)). Indeed, this Court itself has observed that a remedial district typically will only give minorities an opportunity to elect candidates of their choice when those districts contain some adjustment for historically depressed turnout and registration. *See Euclid II*, 523 F. Supp. 2d at 645 (citations omitted); *see also Euclid I*, 580 F. Supp. 2d at 610 ("[The] white turnout rate [in Euclid] . . . over the last decade has often been triple the turnout among African-Americans.").[26]

Thus, while VAP statistics are a reasonable starting point for the Court's remedial analysis, the Court must also "carefully consider and evaluate the data concerning voter registration and turnout . . . to determine [what remedy is needed] in order to give minorities a reasonable and fair opportunity to elect candidates of their choice." *Ketchum*, 740 F.2d at 1414. And, the Court must make these assessments after a careful consideration, not just of these numerical measures (VAP and turnout), and of the relationships between them, but of relevant "political and sociological" considerations that

---

[26] There is, unquestionably, tension between the notion that the proper remedy for a Section 2 violation must to some degree adjust for low minority voter turnout and the principle that courts imposing remedial measures under Section 2 are not to guarantee particular results. It might well have been better had the early courts focused at least partially on remedial measures designed to increase minority turnout and not solely on the creation of "super-majority" districts, which take substantially lower turnout as a given. Nevertheless, a district court would be ill-advised to impose such a change at this late date. *Cf. Barnett v. City of Chicago*, 141 F.3d 699, 703 (7th Cir. 1998) (Posner, J.) ("Insofar as this approach to determining majority status seems to reward groups whose members do not bother to register or vote though eligible to do so, it can be questioned as an original matter; but the approach is well entrenched in the cases. . . ."). The Court observes, however, that nothing in the case law would seem to prohibit a future defendant from proposing a remedial plan that included, among other electoral adjustments, various ameliorative actions designed to boost minority turnout.

might affect the Court's analysis of those numbers and their import.  *Id*. at 1412; *see also Dillard II*, 699 F. Supp. at 874-875.

While, as noted above, some of the recent political and sociological factors this Court must consider include significant increases in the African-American population in the City, this Court's remedial order in *Euclid II* and the results of the March, 2008 special election following that order, and apparent changes in voter attitudes caused by and reflected in the most recent Presidential election, there are longer-term political and sociological factors that cut the other way and cannot be ignored. Thus, as this Court found in *Euclid I*, there has been a history of discrimination in the areas of housing, education, and employment in the City of Euclid that depressed the political participation of African-Americans, there were voting procedures in place for decades (slotted-at-large systems and candidate slating) that enhanced the dilution of African-American voting strength, and there was statistically strong evidence of racial bloc voting in the City.  *See Euclid I*, 580 F. Supp. 2d at 612-13.  These are powerful vote dilutive factors with necessarily deep rooted effects on the ability and willingness of African-Americans to participate in the political process.  The vestiges of this vote dilution are not likely to disappear overnight, even in the face of sudden new opportunities to better participate in the political process.  *See id*.

### 3.  The Court Will Extend *Ketchum*, and Apply a Two-Thirds Presumption to the Threshold of Exclusion to Develop a Baseline for Measuring Compliance with Section 2

There is no bright-line rule to guide a district court as to how much adjustment to VAP is appropriate to assure minorities a meaningful opportunity to participate in the political process, and "the Supreme Court continually stresses . . . that resort to absolutes is inappropriate in evaluating minority voting strengths."  *Puerto Rican Legal Defense & Educ. Fund, Inc. v. Gantt*, 796 F. Supp.

681, 689 (E.D.N.Y. 1992).[27]  Still, *Ketchum* represents a common starting point for single-member districts:

> A guideline of 65% of total population has been adopted and maintained for years by the Department of Justice and by reapportionment experts and has been specifically approved by the Supreme Court in circumstances comparable to those before us as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice. This figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15%. This leads to a total target figure of 65% of total population.  Obviously if voting age population statistics are used, 5% would drop out of the formula, leaving something in the vicinity of 60% of voting age population as the target percentage.

*Ketchum*, 740 F.2d at 1415; *see also African Am. Voting Rights Legal Defense Fund v. Villa*, 54 F.3d 1345, 1348 (8th Cir. 1995) ("[W]e conclude that either 60% of the voting age population or 65% of the total population is reasonably sufficient to provide black voters with an effective majority"); *NAACP v. Austin*, 857 F. Supp. 560, 564-565 (E.D. Mich. 1994) (affirming the *Ketchum* guideline); *Good v. Austin*, 800 F. Supp. 557, 561 (W.D. Mich. 1992) (same); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1198 (E.D. Ark. 1990) (same).  Generally, it is clear that "a district gives minorities a reasonable opportunity to elect candidates of choice where it has a sufficient cushion of approximately 60% of the voting-age population."  *Euclid II*, 523 F. Supp. 2d at 645 (citations omitted).

The *Ketchum* guideline assumes that minority turnout will be depressed to some degree – in particular, that African-American turnout will be two-thirds of non-minority turnout.[28]  This is, of

---

[27] Although, "the approach of focusing mechanically on the percentage of minority population (or voting age population or registered voters) in a particular district, without assessing the actual voting strength of the minority in combination with other voters, has been justly criticized," *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1322 (S.D. Fla. 2002), both of these parties implicitly assume in their filings that Euclid does not exhibit any cross-over voting, where non-minorities join with African-American voters to elect the African-American preferred candidate.  Given the pronounced lack of success of minority candidates in Euclid, such an assumption may well be more reasonable here than in most modern cases.

[28] *Ketchum* advises creation of majority-minority districts in which the minority voting age population is 60% of the district's total voting age population.  In other words, *Ketchum* states that, because of historical issues, it is necessary to create a cushion for minority voters to account, at least

course, not true *currently* on a national level – African-American turnout is now almost equivalent to non-minority turnout.  Indeed, in some states, African-Americans "now register and vote at higher rates than whites."  *Northwest Austin*, 2009 U.S. LEXIS 4539, at *13.  It is also not true *historically* in Euclid; 1995 – 2003 turnout estimates show African-American turnout in Euclid to have been about one-quarter of non-minority turnout.  The *Ketchum* guideline does not purport to be a mathematically precise measure of actual turnout, however.  It is, instead, a figure arrived at through the use of certain theoretical assumptions which, though seemingly somewhat arbitrary when placed into a mathematical formula, are designed to account for the effects of historical vote dilution, while not over accounting for it.

   Ultimately, given the unique characteristics of Euclid, the Court concludes that the two-thirds guideline *Ketchum* and its progeny employ when evaluating single-member districts also represents an appropriate balance between historical turnout and VAP when considering the Board's limited voting proposal.  In Euclid, the minority turnout percentage from 1995-2003 was a small fraction of non-minority turnout and the Court has found that there are numerous historical, political, and sociological factors contributing to that depressed turnout rate.  It is also true, however, that rapidly shifting demographics and legal and social changes now portend a likely increase in that turnout.  For these reasons, and those discussed above, while the Court is not prepared to assume, as does the United States, that Euclid's turnout rates will remain at their historically low levels, the Court does believe

_____

to some extent, for lower turnout and registration, and advises courts to consider creating district that are 60% minority VAP.  Although *Ketchum* and its progeny never transpose that 60% figure into a ratio of minority turnout to non-minority turnout, mathematically this is the same as assuming that minorities will turnout at only two-thirds the rate of non-minorities.  To see why this is so, imagine the creation of a district under *Ketchum* with 60 minorities and 40 non minorities.  If every non-minority votes (100% non-minority turnout = 40 voters), then two-thirds of the minority population (actually, two-thirds + 1) must vote to elect their candidate of choice  (66.67% minority turnout = 40 votes).  This ratio, of course, holds no matter what the percentage of non-minority turnout (e.g., 50% non-minority turnout = 20 votes; 30% minority turnout = 20 votes).  As previously stated, of course, cases such as *Ketchum* assume no cross-over voting.  *But cf. Martinez*, 234 F. Supp. 2d at 1322.

that an assumption of equal turnout rates ignores the effects of historical vote dilution that undoubtedly still linger.  Instead, this Court uses the two-thirds turnout assumption outlined here as a mechanism to provide the "sufficient cushion" needed to assure a reasonable opportunity for African-Americans to elect a candidate or candidates of their choosing.  *See Euclid II*, 523 F. Supp. 2d at 645  (citing *Ketchum*, 740 F.2d at 1413; *Cottier*, 475 F. Supp. 2d at 938).

The Court's conclusion, indeed, is bolstered by the United States' own analysis.  The United States, of course, has proposed the creation of single-member districts, one of which it defines as an "opportunity" district – in this district, African-Americans would be 60% of the VAP.  (*See* Plaintiff's Br. of March 2, 2009, Ex. B at 3; Plaintiff's Br. of April 17, 2009, Ex. A at 8.)[29]  In other words, the United States uses precisely the same expected two-thirds turnout ratio to support its proposed remedy that the Court now uses to evaluate the Board's limited voting proposal.

### D.  The Board's Limited Voting Proposal Does Not Violate Section 2

Taking into account all of the above factors, this Court must accept the Board's limited voting proposal.  In reaching this conclusion, the Court again notes that its task is not to inquire whether the Board's proposal is the "best" possible proposal, or even to weigh the Board's proposal against other possibilities to see if it could somehow be made "better."  The Court considers only whether the Board's limited voting proposal will remedy the Section 2 violation and not itself violate Section 2.  It does, and does not, respectively.

African-Americans currently make up approximately 40% of the VAP of Euclid.  (Plaintiff's Br. of April 17, 2009, Ex. A at 5.)  The two-thirds guideline extrapolated from both *Ketchum* and the Plaintiff's own remedial plan suggests that African-American voters in Euclid will comprise 27% of

---

[29] The Plaintiff proposes the creation of a single majority-minority district that is approximately 60% African-American.  (Plaintiff's Br. of March 2, 2009, Ex. B at 3; Plaintiff's Br. of April 17, 2009, Ex. A at 8.)  Such a district will only result in the election of the African-American preferred candidate if African-American turnout is at least 2/3s the rate of non-minority turnout.

the electorate.[30]  This is above the threshold of exclusion for a three-seat election and, consequently, enough to elect one candidate to the Board under the Board's limited voting proposal.  (*See id.*, Ex. A at 6.)[31]  The Court further observes that, if African-Americans in Euclid ultimately were to turnout at 85% the rate of non-minorities, they would be able to elect two candidates of their choice to the Board, because they would then also be above the threshold of exclusion for a two-seat election.  (*See id.*)[32] In other words, so long as African-Americans ultimately turnout at 85% the rate of non-minorities, they will very likely elect the same percentage of Board members as their total percent of the VAP. For all of the reasons explained above and primarily in Section III. C. of this opinion, the Court finds that the Board's limited voting proposal affords African-Americans a meaningful opportunity to participate in the political process under Section 2, even though they will need to increase their turnout percentage to take full advantage of it.[33]

---

[30] 2/3 x 40% = 27%.  The threshold of exclusion for a three-seat election, such as the 2009 Euclid School Board election, is 25%.

[31] Alternatively, the Court notes that if an additional 4% of 1995-2003 African-American non-voters were to vote, that would be enough to meet the threshold of exclusion to elect one candidate. (Hrg. Tr. of May 19, 2009 at 119:15-24, Plaintiff's Expert Dr. Lisa Handley ("Handley") ("[Y]ou would need 4% of the blacks who didn't vote who are of voting age population to vote in order to meet the threshold of exclusion.").)  The Court finds according to this measure, too, that the Board's plan provides minorities a meaningful opportunity for participation.

[32] .85 x 40% = 34%.  The threshold of exclusion for a two-seat election, such as the 2011 Euclid School Board election, is 33.3%.

[33] The United States' original proposed alternative to the Board's plan calls for the creation of five single-member districts: one that is 61% African-American and four other districts in which African-Americans are a minority.  (Plaintiff's Br. of March 2, 2009, Ex. B at 3; Plaintiff's Br. of April 17, 2009, Ex. A at 8.)  *If this Court were to apply historical turnout to those districts, not a single one would elect an African-American preferred candidate.*  As previously noted, the Plaintiff's plan only produces an African-American preferred candidate by using the very same two-thirds turnout assumption employed above.  Although the Court did not reach its conclusions by comparing the Board's plan to the Plaintiff's plan, this example helps demonstrate that even the Plaintiff does not really appear to believe that it is appropriate to be wedded to the 1995-2003 turnout numbers.

In light of the Plaintiff's implicit use of the very two-thirds turnout number necessary to meet the threshold of exclusion under the Board's plan, the Court has had difficulty understanding the basis of the Plaintiff's objection to the Board's proposal. The Plaintiff has pointed this Court to the

**E.  Conclusion**

This Court has carefully considered the remedies proposed by the Board.  For the aforementioned reasons, after a searching inquiry into the totality of the circumstances, it is clear that the Board's limited voting proposal remedies the violation of Section 2 of the Voting Rights Act that this Court has found and does not, itself, violate that Act.  Consequently, this Court concludes that the **DEFENDANT** has proposed a legally acceptable remedy and **ORDERS** the Board and the Cuyahoga County Board of Elections to implement the **LIMITED VOTING** proposal outlined in its briefing and described in the May 19-20, 2009 remedial hearing before the Court.


**IT IS SO ORDERED.**

> **s/Kathleen M. O'Malley**
> **KATHLEEN McDONALD O'MALLEY**
> **UNITED STATES DISTRICT JUDGE**

**Dated: July 13, 2009**

---

very same cases as the Defendant and has, with the few exceptions noted above, urged the Court to interpret those cases in the same way.  The only basis for the Plaintiff's objection has been the contention that the Defendant's plan should be measured using the 1995-2003 turnout data, but the Plaintiff rejects that data as a tool through which to measure its own proposal.

As noted above, the United States proposed another alternative remedy at the May 19-20, 2009 remedial hearing: limited voting with concurrent terms.  Putting aside the problem posed by a remedy that would prematurely end the terms of office for certain current office holders, the Court also refuses to substitute this proposal for that put forth by the Board.  While concurrent (or "unstaggered")  terms might, like a larger Board, provide a marginally better remedy, because the Board's current proposal is adequate, it would be inappropriate for this Court to rewrite it.  *See Wise*, 437 U.S. at 539-41; *Bone Shirt*, 461 F.3d at 1022.

42