**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No. 08-CV-2832 |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| v. | : | |
| **EUCLID CITY SCHOOL BOARD,** *et al.*, | : | **MEMORANDUM & ORDER** |
| | : | |
| **Defendants.** | : | |

### I. INTRODUCTION

This matter arises upon motion by the Plaintiff, the United States. After the Court entered judgment on July 13, 2009, (Doc. 47), the United States timely appealed. Shortly thereafter, the United States moved to dismiss that appeal and the United States Court of Appeals for the Sixth Circuit granted that motion. Nearly six months after its appeal was dismissed, the United States filed the instant motion, pursuant to Federal Rule of Civil Procedure 60(b)(6), asking this Court to: (1) vacate its July 13, 2009 Order ("July 2009 Order"); and (2) order Defendants, Euclid City School Board ("Board"), to "implement an electoral plan that includes the United States' proposed single-member district remedy, or in the alternative, a limited voting plan with unstaggered terms." (Doc. 51-1 at 13.) The Board has opposed the Government's motion, and the motion is now ripe for adjudication. For the reasons discussed below, the United States' motion is **DENIED**.

### II. BACKGROUND

This dispute between the parties has a long history. As outlined in United States v. Euclid City Sch. Bd., 632 F. Supp. 2d 740 (N.D. Ohio 2009) ("Euclid III"), the parties stipulated that the City of Euclid's former method of electing school board members denied minorities the opportunity

to participate meaningfully in the political process, in violation of § 2 of the Voting Rights Act ("Section 2"), as amended, 42 U.S.C. § 1973. Euclid III, 632 F. Supp. 2d at 743.[1] After examining the stipulation and the facts of the case, this Court agreed that the method of electing Euclid City School Board members violated Section 2. Id. at 754–55. After concluding that Section 2 was violated, this Court considered the Board's proposed remedies. Id. at 755–71.

While the Board offered two proposed remedies, one based on limited voting and the other based on cumulative voting,[2] the Court rejected use of cumulative voting as too complex, unusual, and difficult to administer. The Court then analyzed whether the Board's limited voting proposal remedied the Section 2 violation. Id. at 757. As an initial matter, this Court concluded that the Board's proposed limited voting proposal was not per se impermissible because of its use of at-large staggered elections. Id. at 760. Next, the Court analyzed whether the Board's proposal actually remedied the Section 2 violation without itself constituting a Section 2 violation. Id. at 770. As discussed at length in Euclid III, the parties contested the tests the Court should employ when considering the adequacy of the Board's limited voting proposal. This same dispute is the focus the United States' instant motion.

To evaluate the remedial effectiveness of a limited voting proposal, courts frequently "use a common political science construct that measures the 'threshold of exclusion' to determine

---

[1] As Euclid III more fully explains, "this stipulation of liability was based in part upon the conclusions reached by this Court during prior litigation, which considered the very same electoral population" involved in this action. Euclid III, 632 F. Supp. 2d at 745 (citing United States v. City of Euclid, 580 F. Supp. 2d 584 (N.D. Ohio 2008) ("Euclid I") and United States v. City of Euclid, 523 F. Supp. 2d 641 (N.D. Ohio 2007) ("Euclid II")).

[2] Both of the proposed remedial plans offered by the Board featured staggered, at-large elections. Because the Euclid City School Board is comprised of five members each with two-year terms, every two years either two or three members are elected. In 2009, three seats were elected, while in 2011, two seats will be elected. See Euclid III, 632 F. Supp. 2d at 757, 761.

whether minorities have the opportunity to elect candidates of their choosing . . . ." Id. at 761. The "threshold of exclusion" is defined as "the percentage of the vote that will guarantee the winning of a seat even under the most unfavorable circumstances." Id. (quoting Dillard v. Cuba, 708 F. Supp. 1244, 1246 (M.D. Ala. 1988)). The parties agreed that:

> Under the Board's proposal, the threshold of exclusion for the 2009 3-seat election is 25% and the threshold of exclusion for the 2011 2-seat election is 33.3%. In other words, assuming the worst-case scenario contemplated by the threshold of exclusion, African-Americans will elect a preferred candidate in 2009 if they comprise 25% of the voters on election day (as distinguished from [Voting Age Population ("VAP")], the potential voters on election day) and African-Americans will elect a preferred candidate in 2011 if they comprise 33.3% of actual voters.

Euclid III, 632 F. Supp. 2d at 761. To determine whether the Board's proposal would cure the Section 2 violation, this Court needed to analyze whether a sufficient number of minority voters existed to meet the threshold of exclusion.

The parties' dispute focused on which turnout model this Court should use to determine if minorities will be able to meet the threshold of exclusion. For its part, "the Board would have the Court look to the VAP for both African-American and non-minority populations in Euclid, assume an equal percentage of turnout from those respective populations, and apply those measures against the threshold of exclusion." Id. at 762. The United States argued, however, that the Board's proposal only cured the Section 2 violation if the threshold of exclusion was met when historical turnout percentages were applied to the current VAP. Id. In other words, "the United States asks the Court to assume that African-Americans and non-minorities will turn out in the same percentages that they turned out in races for which historical turnout data exists (the years 1995-2003) and apply *those* percentages against VAP to decide if the threshold of exclusion is met." Id. Because this Court found exclusive reliance on either of the turnout models suggested by the parties unreasonable, it decided to choose an alternative approach, which struck an "appropriate balance

-3-

between historical turnout and VAP when considering the Board's limited voting proposal." Id. at 769.

> Explaining this middle-ground approach, the Court stated:
>
> In Euclid, the minority turnout percentage from 1995-2003 was a small fraction of non-minority turnout and the Court has found that there are numerous historical, political, and sociological factors contributing to that depressed turnout rate. It is also true, however, that rapidly shifting demographics and legal and social changes now portend a likely increase in that turnout. For these reasons, and those discussed above, while the Court is not prepared to assume, as does the United States, that Euclid's turnout rates will remain at their historically low levels, the Court does believe that an assumption of equal turnout rates ignores the effects of historical vote dilution that undoubtedly still linger. Instead, this Court uses the two-thirds turnout assumption outlined here as a mechanism to provide the "sufficient cushion" needed to assure a reasonable opportunity for African-Americans to elect a candidate or candidates of their choosing.

Id. (citations omitted). Applying the two-thirds turnout model, this Court concluded that the Board's limited voting proposal cured the Section 2 violation without itself violating Section 2. Id. at 770.[3] Explaining this conclusion, the Court noted that its task was to determine only whether the Board's limited voting proposal will remedy the Section 2 violation and not itself constitute a Section 2 violation. Id. The Court was not "to inquire whether the Board's proposal is the 'best' possible

---

[3] This Court stated:

> African-Americans currently make up approximately 40% of the VAP of Euclid. The two-thirds guideline extrapolated from both Ketchum v. Byrne, 740 F.2d 1398, 1415 (7th Cir. 1984), and the Plaintiff's own remedial plan suggests that African-American voters in Euclid will comprise 27% of the electorate. This is above the threshold of exclusion for a three-seat election and, consequently, enough to elect one candidate to the Board under the Board's limited voting proposal. The Court further observes that, if African-Americans in Euclid ultimately were to turnout at 85% the rate of non-minorities, they would be able to elect two candidates of their choice to the Board, because they would then also be above the threshold of exclusion for a two-seat election.

Euclid III, 632 F. Supp. 2d at 770 (internal citations omitted).

proposal, or even weigh the Board's proposal against other possibilities to see if it could somehow be made 'better.' " Id.

Approximately four months after this Court approved the Board's limited voting proposal, the City of Euclid held school board elections under the approved proposal. In this election, one African-American candidate and three white candidates ran for the three open seats. (Doc. 51-1 at 3.) The three white candidates were elected to the open seats. Significantly, "the first choice of both African-American and white voters" was elected. (Id. at 5.) On the basis of these election results, the United States argues that Rule 60(b)(6) relief from the July 2009 Order is necessary because "[t]he results of the School Board's subsequent November 2009 elections demonstrate that this electoral plan did not remedy the Defendant's conceded violation of Section 2 of the Voting Rights Act, because – consistent with historical patterns – African-American turnout remained ineffectively low in 2009." (Id. at 1.) In other words, the United States argues that this Court's July 2009 Order was legally erroneous because "the two-thirds presumption underlying the court-ordered remedy does not adequately account for the persistent vestiges of racial discrimination in Euclid." (Id. at 5.) As explained below, the United States' motion is both procedurally improper and substantively incorrect. The motion is, accordingly, **DENIED**.

### III. LEGAL FRAMEWORK

Federal Rule of Civil Procedure 60(b) states that:

[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic, misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying its prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). The United States' motion is based upon subsection six. The Sixth Circuit has explained that "Rule 60(b)(6) should apply 'only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule.' " Mallory v. Eyrich, 922 F.2d 1273, 1280 (6th Cir. 1990) (quoting Hopper v. Euclid Manor Nursing Home, Inc., 867 F.2d 291, 294 (6th Cir. 1989) (citing Pierce v. United Mine Workers of Am. Welfare and Retirement Fund for 1950 and 1974, 770 F.2d 449, 451 (6th Cir. 1985))). In keeping with the strict standards applied to motions for relief pursuant to Rule 60(b)(6), "Courts . . . must apply subsection (b)(6) only as a means to achieve substantial justice when something more than one of the grounds contained in Rule 60(b)'s first five clauses is present." Olle v. Henry & Wright Corp., 910 F.2d 357, 365 (6th Cir. 1990) (citations omitted). Courts have construed "something more" to require "unusual and extreme situations where principles of equity mandate relief." Id.

### IV. ANALYSIS

In its motion, the United States argues that this Court erred by: (1) adopting the two-thirds voter turnout model; and (2) concluding that the Board's limited voting proposal cured the Section 2 violation. As referenced above, the motion is both procedurally and substantively deficient.

#### A. The United States' Motion is Untimely and Procedurally Improper

The United States' motion is procedurally deficient because it is untimely. After careful review of the United States' motion, it is clear that it is based on an assertion of legal error. The United States is arguing that the July 2009 Order should be vacated because this Court erred in adopting the two-thirds voter turnout model when it determined that the Board's limited voting proposal cured the Section 2 violation. (Doc.51-1 at 7.) In light of this alleged error, the United States asserts that this Court adopted a remedial plan that does not cure the Section 2 violation. (Id. at 10–11.)

A party's assertion of legal error, however, is "subsumed in the category of mistake under Rule 60(b)(1)." Pierce, 770 F.2d at 451(citing Barrier v. Beaver, 712 F.2d 231, 234 (6th Cir. 1983)). Absent extraordinary circumstances, moreover, "[a] claim of strictly legal error . . . is not cognizable under 60(b)(6) . . . ." Cincinnati Ins. Co. v. Byers, 151 F.3d 574, 578 (6th Cir. 1998) (citing Hopper, 867 F.2d at 294). Even assuming that the United States could establish extraordinary circumstances, however, its motion is untimely because "a Rule 60(b)(6) motion that claims legal error as justification for the relief sought must be brought within the time permitted to appeal from the judgment in question." Cincinnati Ins., 151 F.3d at 578 (citing Steinhoff v. Harris, 698 F.2d 270, 276 (6th Cir. 1983) (holing that "Rule 60(b)(6) motions also must be brought within the time allowed for appeal if legal error is claimed as justification for granting the Rule 60(b) motion.")). On April 29, 2010 when the United States filed the instant motion, the time to appeal the July 2009 Order had long since expired.  See Fed. R. App. P. Rule 4(a).

In addition, the United States made a conscious decision to dismiss its appeal of the July 2009 Order to the Sixth Circuit.  On November 13, 2009 when it moved to dismiss its appeal, the United States already had the results of November 3, 2009 school board elections.  Accordingly, the United States had an opportunity to appeal the July 2009 Order on the basis of these election results. It chose to forego this opportunity.  In the Sixth Circuit, "[i]t is settled that a 60(b) motion 'cannot be used to avoid the consequences of a party's decision to forego an appeal from an adverse ruling.' " Pierce, 770 F.2d at 451–52 (quoting Steinhoff, 698 F.2d at 275) ("The interests of finality of judgments and judicial economy outweigh the value of giving a party a second bite of the apple by allowing a 60(b) motion, after the appeal period has run, on the same legal theory that would have been asserted on appeal.").  The United States' motion is, therefore, both untimely and an impermissible attempt to avoid the consequences of its decision to dismiss its appeal.

## B. Approving the Board's Limited Voting Proposal Was Not Legal Error

Although the United States' motion is procedurally improper, this Court will, in an abundance of caution, address the substantive merits of it.[4] As discussed above, the United States asserts that this Court erred by adopting the two-thirds voter turnout model, and argues that, because of this error, the Court erroneously concluded that the Board's limited voting proposal adequately remedied the Section 2 violation. The United States' assertions of error are not well-taken.

As the July 2009 Order explained in detail, "a legally acceptable plan is one that corrects the existing Section 2 violation without creating one anew." Euclid III, 632 F. Supp. 2d at 752. An acceptable plan does not, however, guarantee success at the polls. Id. (citing League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 428 (2006)). "The province of a court is to ensure genuine opportunity for all citizens, not to guarantee particular results." Euclid III, 632 F. Supp. 2d at 744; see also League of United Latin Am. Citizens, 548 U.S. at 428 ("We have said that the ultimate right of Section 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."); Baird v. Indianapolis, 976 F.2d 357, 359 (7th Cir. 1992) ("[T]he electoral process ensures equality of opportunity and not equality of outcome."). The United States' motion is substantively deficient because it overlooks this governing law as well as the facts underlying the 2009 school board election.

First, the United States glosses over the fact that the African-American preferred candidate, Kent Smith, actually won one of the three open seats. (Doc. 51-1 at 5.) Kent Smith received in

---

[4] Because the United States' motion is an untimely effort to revive its earlier abandoned appeal of this Court's July 2009 Order, consideration of the merits is not complete absent full reference to and consideration of the many findings and conclusions in that earlier order. Rather than try to repeat the lengthy analysis in that order here, the Court incorporates it by reference and attaches it as an appendix hereto. In addition to the findings set forth here, the Court also relies on its July 2009 legal analysis and findings of fact.

excess of 59% of the African-American votes cast in the relevant election. Rather than focusing on this reality, the United States argues that, if all of the African-American votes received by Kent Smith were instead allocated to the African-American candidate, Evette Moton, she would not have won. Based on this hypothetical, the United States asserts that African-American voters do not have a reasonable opportunity to elect candidates of choice because these election results establish that "candidates favored by blacks can win, but only if the candidates are white." (Id. at 9 (quoting Rural W. Tenn. African-American Affairs Council v. Sundquist, 209 F.3d 835, 840 (6th Cir. 2000).) Given the 2009 school board election results, however, this argument is incorrect.

As the Board points out, if you take all of the African-American votes received by every candidate and reallocate those votes to Ms. Moton, she would have won one of the three open seats on the school board. (Doc. 54-1 at 7.) In other words, had African-Americans voted cohesively as they had the choice to do given the limited voting model employed, they could have elected an African-American candidate. Thus, had Ms. Moton actually been the minority preferred candidate, she would have been one of those elected to the School Board.

While the United States asserts that Ms. Moton would not have won based on this reallocation, (Doc. 51-2 at 8), it only reaches this conclusion by disregarding all the votes Ms. Moton actually received from non-minority voters, i.e., 372 votes, which represents 5.2% of the total votes cast by non-minority voters. Id. The United States seems to be arguing that the results of the 2009 election establish that African-American voters do not have a reasonable opportunity to elect their candidate of choice. In support of this argument, the United States notes that if you alter the election results to represent the worst-case scenario, in which no white voters voted for Ms. Moton, African-American voters could not have elected her.

The United States is, thus, asking this Court to set aside its earlier ruling based on a

hypothetical election that did not occur. While reference to a hypothetical "separate electorates" test is appropriate when assessing whether historical voting patterns are racially polarized, use of that test once substantial impediments to voter participation have been removed is not particularly meaningful. And, use of that test in the absence of political cohesion among minority voters is completely inappropriate.[5] Cf. Thornburg v. Gingles, 478 U.S. 30, 51 (1986) (holding that political cohesion is a "necessary precondition[] for multimember districts to operate to impair minority voters' ability to elect representatives of their choice . . . ."). That the United States apparently wishes that African-American voters had chosen to cast their ballots differently does not change the fact that Kent Smith was the overwhelming choice of most African-Americans who cast a ballot.

Next, the United States argues that the 2009 election is proof that this Court erred by adopting the two-thirds voter turnout model to analyze the effectiveness of the Board's limited voting proposal. In support of this argument, the United States argues that, because African-American turnout "represented only 19.8% of the total electorate in 2009," (Id. at 8), a figure which is below the 25% threshold of exclusion, "African-Americans will not be able, in the foreseeable future, to elect a candidate of choice unless that candidate also happens to be white preferred." (Id. at 9.) As discussed above, however, African-American voters could have elected an African-American candidate in 2009, and this candidate was not white preferred. The facts simply do not support the arguments asserted by the United States. The 2009 election was not an election in which African-Americans cohesively supported an African-American candidate and this candidate was vetoed by white voters.

---

[5] Ms. Moton received only 18.9% of the African-American vote. 51.9% of the African-American votes went to Mr. Smith and the remainder was distributed between the two other non-minority candidates.

-10-

As this Court highlighted in the July 2009 Order, moreover, evaluating the Board's proposed limited voting proposal on the basis of only historical turnout rates "comes dangerously close to guaranteeing a particular outcome for one group of voters, rather than ensuring equal opportunity." Euclid III, 632 F. Supp. 2d at 764 (citing Baird, 976 F.2d at 359). Because the threshold of exclusion is a worst case scenario, in which there is no non-minority crossover voting, "if a court were to combine such a 'worst-case scenario' with historically low turnout numbers, that court would be all but guaranteeing a particular outcome, a result that is clearly forbidden." Euclid III, 632 F. Supp. 2d at 764. The United States is essentially arguing that this Court committed error by refusing to measure the adequacy of the Board's proposed remedy by a standard that effectively guarantees specific electoral results. As discussed at length in Euclid III, determining the adequacy of a proposed remedy by this standard is not permissible.

To the extent the United States argues that the remedy adopted by this Court was inadequate because African-Americans will not be able to elect a school board member in 2011 unless their turnout is 85%, this assertion is incorrect. As explained above, the threshold of exclusion is a worst-case scenario. It assumes that no non-minority voters will vote for the minority preferred candidate. Contrary to this assumption, however, in the 2009 elections, there was non-minority crossover voting for both the minority preferred candidate and the African-American candidate.

The United States' arguments also overlook the need for African-Americans to come to the polls and vote. See Salas v. Sw. Tex. Junior Coll. Dist., 964 F.2d 1542, 1556 (5th Cir. 1992) ("[A] protected class is not entitled to Section 2 relief merely because it turns out in a lower percentage than whites to vote . . . ."). "While the effects of long-standing electoral discrimination on voter turnout are undeniable, there is assuredly some point at which potential voters must themselves come to the polls." Euclid III, 632 F. Supp. 2d at 763. The July 2009 Order took into account the

need to balance the reality of lower minority turnout, which this Court found was caused by electoral discrimination, with the requirement that the remedy only provide an equal opportunity to participate in the political process, and not ensure a particular outcome. Analyzing the Board's proposed remedy by assuming that African-Americans would turnout at two-thirds the rate of non-minority voters balanced these competing factors.

Finally, neither of the parties discuss the fact that this Court was required to approve the Board's limited voting proposal unless it failed to remedy the Section 2 violation or it violated Section 2 itself. Id. at 750. Much of the United States' arguments imply that its proposed plan would remedy the Section 2 violation *more effectively* than the Board's proposal. This was not, however, the question before the Court. Under the appropriate analysis, using the two-thirds presumption, the Board's proposal cured the Section 2 violation and it did not itself violate Section 2. This conclusion ended the inquiry.

## V. CONCLUSION

The United States' reliance on a single set of election results does not convince this Court that the balance struck by the two-thirds presumption was incorrect, much less that it was legal error accompanied by extraordinary circumstances sufficient to warrant relief under Rule 60(b)(6). The reality is that African-Americans elected their candidate of choice in the 2009 election. If African-American voters had voted cohesively for the only African-American candidate, moreover, that candidate would have been elected. Far from establishing that this Court committed legal error by choosing the two-thirds presumption and approving the Board's limited voting proposal, the 2009 election results actually demonstrate that African-American voters in Euclid now have the ability to elect candidates of their choice, whether that candidate is African-American or white.

Accordingly, because it is both procedurally improper and lacks substantive merit, the United

States' Motion is **DENIED**.

    **IT IS SO ORDERED.**

                                              <u>**s/Kathleen M. O'Malley**</u>
                                              **KATHLEEN McDONALD O'MALLEY \***

**Dated: October 28, 2011**

    *\* United States Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.*